782 F.2d 1400
 121 L.R.R.M. (BNA) 2702, 54 USLW 2426,
7 Employee Benefits Ca 1059
 INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW,
and Its Local 449, Plaintiffs-Appellees,
v.
KEYSTONE CONSOLIDATED INDUSTRIES, INC., Defendant-Appellant.
 No. 84-1722.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 23, 1985.
Decided Feb. 3, 1986.
 
 M. Jay Whitman, UAW Legal Dept., Detroit, Mich., for plaintiffs-appellees.
 Robert C. Long, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellant.
 Before COFFEY and FLAUM, Circuit Judges, and JAMESON, Senior District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 The issue presented in this case is whether the district court erred in enforcing an arbitrator's award requiring the defendant employer to make annual contributions to a pension plan even though the employer had obtained an ex parte waiver of the plan's annual minimum funding requirement pursuant to section 303 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1083 (1982). We reverse.
 
 I.
 
 2
 The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union") and the National Lock Division of Keystone Consolidated Industries, Inc. ("Keystone") have been parties to a series of pension agreements since 1955. Beginning in 1968 and continuing to the present, these pension agreements have provided that Keystone shall make contributions to the pension's trust fund on an annual basis. The amount that Keystone must contribute each year is calculated according to the language of the agreement.
 
 
 3
 In June 1981, Keystone issued a summary annual report to the pension plan's participants, the members of the Union, as required by ERISA. In this report, Keystone revealed that it had sought a waiver of its 1979-1980 pension plan contribution in December 1980 on the advice of its accountants pursuant to section 303 of ERISA, 29 U.S.C. Sec. 1083 (1982). This provision empowers the Secretary of the Treasury to waive ERISA's statutory minimum funding requirement for a given plan year after the Secretary considers the financial condition of the employer and the effect of such a waiver on the employees. 29 U.S.C. Sec. 1083(a). The amount that is waived pursuant to section 303 is then paid back into the plan over a fifteen-year period. Sec. 1082(b)(2)(C). The report issued by Keystone revealed that the Internal Revenue Service ("IRS"), acting on behalf of the Secretary of the Treasury, had granted Keystone's request for a waiver of its annual contribution based on evidence that Keystone was experiencing severe financial difficulties in 1979 and 1980. At that time, Keystone had suffered a net loss of almost $3.5 million for the fiscal year beginning on July 1, 1979, and a net loss of over $2.5 million in the following year due to serious downturns in the industries to which it sold its products. The IRS found that Keystone was experiencing great difficulty in maintaining a sufficient amount of working capital to prevent a technical default under its prime loan obligations to the Continental Illinois National Bank. However, the IRS concluded that Keystone would probably be able to recover from its temporary financial difficulties as a result of its modernization efforts and its program to reduce costs.
 
 
 4
 In September 1981, the Union filed grievances with an arbitrator pursuant to the Union's collective bargaining agreement with Keystone, alleging that Keystone had violated the annual funding provision of the pension agreement by failing to make its contribution to the plan for the 1979-1980 plan year. After the arbitrator held an evidentiary hearing and reviewed the briefs submitted by the parties, he issued an award in favor of the Union and ordered Keystone to pay $2,147,932 to the pension fund with interest at 8 1/2% per year from July 1, 1980, until paid. After the issuance of the arbitrator's decision, the parties became involved in a dispute as to when the award was to be paid. The Union claimed that the award required the immediate payment of the full amount, while Keystone claimed that the award required payment of the full amount, but in conformity with the fifteen-year equal installment payment schedule as provided for in ERISA. As a result of this dispute over the construction of the arbitrator's award, the Union filed suit under section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (1982), to have the district court enforce the award.
 
 
 5
 On June 16, 1983, the district court denied both the Union's and Keystone's motions for summary judgment without prejudice and remanded the case to the arbitrator for clarification of the award. However, the district court did state that while ERISA sets minimum standards for contributions to pension plans, it does not prohibit an employer from undertaking greater contractual obligations in a pension agreement. On July 5, 1983, the arbitrator explained that Keystone was to pay the 1979-1980 plan year contribution immediately because Article VI, section 2 of the pension agreement specifically provided that: "The Company agrees to make contributions to the trust fund on an annual basis...." Both parties then renewed their motions for summary judgment before the district court. The Union requested that the district court enforce the arbitrator's decision. Keystone argued that the court should not enforce the arbitrator's award because the award directly conflicted with and nullified the waiver provision of ERISA. On February 27, 1984, the district court granted the Union's motion for summary judgment in a minute order, relying on the reasons that it had specified in its June 16, 1983 order.
 
 
 6
 On appeal, Keystone argues that the district court erred as a matter of law in enforcing the arbitrator's award because the award conflicts with the public policies embodied in ERISA. Keystone claims that the safeguards embodied in the waiver provision of ERISA cannot be overridden by a pension agreement because these safeguards were enacted for the benefit of pension plan participants.
 
 II.
 
 7
 Since arbitration has been generally favored by the courts as a means of resolving labor disputes, this circuit has held that a court's review of an arbitration award is extremely limited. Ethyl Corp. v. United Steelworkers, 768 F.2d 180, 183 (7th Cir.1985); Amalgamated Meat Cutters & Butcher Workmen v. Jones Dairy Farm, 680 F.2d 1142, 1144 (7th Cir.1982). Accord Amalgamated Meat Cutters & Butcher Workmen v. Great Western Food Co., 712 F.2d 122, 124 (5th Cir.1983). The Supreme Court has emphasized that under the well-established standards for the review of labor arbitration awards, a court must not refuse to enforce such an award merely because the court believes that its own interpretation of the collective bargaining agreement at issue would be preferable to that of the arbitrator. W.R. Grace & Co. v. Local Union 759, International Union of the United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983). The Court has noted that the federal policy of settling labor disputes by arbitration would be undermined if courts could finally determine the merits of arbitration awards. United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). Thus, the Court has concluded that even if the arbitral award is ambiguous, a court must enforce the award without reviewing the merits of the dispute unless the award does not draw its essence from the collective bargaining agreement. W.R. Grace v. Local Union, 461 U.S. at 764, 103 S.Ct. at 2182 (citing United Steelworkers v. Enterprise Wheel, 363 U.S. at 597, 80 S.Ct. at 1361).
 
 
 8
 Even though courts have acknowledged that their role in reviewing arbitration awards is limited, they have also noted that their role is not a meaningless part of the arbitral process. See, e.g., Sea-Land Services, Inc. v. International Longshoremen's Ass'n, 625 F.2d 38, 42 (5th Cir.1980). The Supreme Court has held that one of the bases that a court can rely on in declining to enforce an arbitration award is that the award is contrary to public policy. W.R. Grace v. Local Union, 461 U.S. at 766, 103 S.Ct. at 2183. See Amalgamated Meat Cutters v. Great Western, 712 F.2d at 124-26 (arbitrator's award directing employer to reinstate a truck driver caught drinking liquor on duty violates public policy and should not be enforced); Amalgamated Meat Cutters v. Jones Dairy, 680 F.2d at 1144-45 (court declined to enforce on public policy grounds an arbitrator's award approving of a company's work rule that prohibited employees from reporting unsanitary working conditions directly to inspectors for the United States Department of Agriculture). However, the Court has stressed that such a public policy must be well-defined and dominant before a court can decline to enforce an award on public policy grounds. W.R. Grace v. Local Union, 461 U.S. at 766, 103 S.Ct. at 2183. See also Amalgamated Meat Cutters v. Jones Dairy, 680 F.2d at 1145. The Court has noted that public policy can be ascertained by reference to the Constitution, treaties, federal statutes, and applicable legal precedents rather than by reference to general considerations of supposed public interests. W.R. Grace v. Local Union, 461 U.S. at 766, 103 S.Ct. at 2183; Hurd v. Hodge, 334 U.S. 24, 34-35, 68 S.Ct. 847, 852-853, 92 L.Ed. 1187 (1948); Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945). Before declaring that an arbitral award violates public policy, however, courts have noted that extreme caution should be exercised in determining what that public policy is. Amalgamated Meat Cutters v. Great Western, 712 F.2d at 124; Union of Transportation Employees v. Oil Transport Co., 591 F.Supp. 439, 443 (N.D.Tex.1984). We hold that the arbitrator's refusal in the present case to apply the waiver provision of ERISA when interpreting the annual funding requirement of the pension agreement violated the clearly defined public policy behind the enactment of ERISA.
 
 
 9
 The Supreme Court has held that one of Congress's central purposes in enacting ERISA in 1974 was to prevent the loss of all retirement savings by employees whose vested benefits in a pension plan are not paid when their employer terminates the plan. Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 374, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980). In its findings and declaration of policy, Congress noted that the growth in the size, scope, and number of employee benefit plans in recent years had been rapid and substantial, that the operational scope and economic impact of such plans was increasingly interstate, that the continued well-being and security of millions of employees and their dependents were directly affected by these plans, that these plans had become an important factor affecting the stability of employment and the successful development of industrial relations, and that these plans had stimulated the interest of the public at large. 29 U.S.C. Sec. 1001 (1982). Congress thus decided that it had to provide minimum standards for such plans in order to assure their equitable character and their financial soundness, to promote the interests of employees and their beneficiaries, to protect the revenue of the United States, and to provide for the free flow of commerce. Id. The Supreme Court concluded from this clear expression of legislative intent that Congress wanted to guarantee that an employee would receive any defined pension benefits to which he was entitled by providing for a minimum funding schedule and by prescribing standards of conduct for plan administrators. Nachman v. Pension Benefit, 446 U.S. at 375, 100 S.Ct. at 1733. See also H.R.Rep. No. 779, 93d Cong., 2d Sess. 80, reprinted in 2 Legislative History of the Employee Retirement Income Security Act of 1974, at 2669 (1976). The Court has stressed that there is no doubt as to what Congress intended in enacting ERISA: to discourage unnecessary termination of pension plans. Nachman v. Pension Benefit, 446 U.S. at 386, 100 S.Ct. at 1738.
 
 
 10
 Section 302 of ERISA provides that contributions to a pension plan must be made on an annual basis in order to satisfy the minimum funding standards. 29 U.S.C. Sec. 1082. However, section 303 allows an employer to obtain a waiver of the minimum funding standards from the Secretary of the Treasury if the employer is unable to satisfy these standards for a particular plan year "without substantial business hardship and if application of the standard would be adverse to the interests of plan participants in the aggregate." 29 U.S.C. Sec. 1083(a).[1] In deciding whether the employer will suffer a "substantial business hardship" without a waiver, the provision directs the Secretary to consider the following factors: (1) whether the employer is operating at an economic loss, (2) whether there is substantial unemployment or underemployment in the trade or business and in the industry concerned, (3) whether the sales and profits of the industry concerned are depressed or declining, and (4) whether it is reasonable to expect that the plan will be continued only if the waiver is granted. Sec. 1083(b)(1)-(4). If the Secretary grants the waiver, the employer must pay the amount necessary to amortize the waived funding deficiency for each prior plan year in equal annual installments over a period of fifteen plan years. Sec. 1082(b)(2)(C). The employer is also required to pay interest on the outstanding balance of the deferred contributions over the period that the contributions are waived.
 
 
 11
 In the present case, we believe that enforcement of the arbitrator's award, which declined to apply ERISA's waiver provision, would be contrary to the well-defined and dominant public policy embodied in ERISA--to protect plan participants from the unnecessary termination of their pension plans. It is clear from the financial difficulties that led Keystone to seek the waiver in the first place that the plan participants very likely faced termination of their benefits if the IRS did not grant Keystone the waiver of contributions for the 1979 -1980 plan year.[2] This is precisely the situation that ERISA's waiver provision was designed to forestall.
 
 
 12
 In making its decision to grant the waiver, the IRS thus considered both the degree of business hardship that Keystone would have faced without the waiver and the interests of the plan participants in the aggregate. Furthermore, the IRS placed the following restrictions in its grant of the waiver: (1) the waiver would be rendered null and void if the pension plan was terminated before July 1, 1985, (2) the outstanding balance of contributions would become immediately due if Keystone made any changes in the rate of accrual or vesting of the benefits, and (3) Keystone could not be granted a waiver for more than five of any fifteen consecutive plan years. By refusing to permit Keystone to rely on the payment schedule outlined in ERISA's waiver provision, the arbitrator jeopardized the continued existence of Keystone's pension plan, to the serious detriment of the plan participants. In view of the clear public policy voiced by Congress in enacting ERISA and reiterated by the courts in interpreting ERISA, we must decline to enforce the arbitrator's award requiring Keystone to pay the 1979-1980 plan year contribution immediately.[3]
 
 
 13
 In conclusion, we reverse the district court's decision enforcing the arbitrator's award.
 
 
 14
 COFFEY, Circuit Judge, dissenting.
 
 
 15
 The majority holds that under the pension agreement, Keystone did not waive its right to obtain a waiver of the ERISA minimum funding requirement from the IRS and that the arbitrator's failure to give effect to the IRS' waiver of the minimum funding requirement violates public policy. In reaching its conclusion, the majority refuses to distinguish between the annual funding requirement contained in the pension agreement and the ERISA minimum funding requirement, set out in 29 U.S.C. Sec. 1082. The validity of the majority's public policy determination depends upon not only the accuracy and fairness of the IRS' determination to grant the waiver of the ERISA minimum funding requirement but also upon the constitutionality of the procedure followed by the IRS in granting the waiver of the ERISA minimum funding requirement. The majority, relying upon an untenable waiver theory, refuses to address the Union's argument that the IRS' procedure for handling requests for waivers of the ERISA minimum funding requirement, which does away with giving the beneficiary notice or a right to be heard, and thus is an unconstitutional deprivation of due process and an unconstitutional delegation of Article III power to an administrative agency. I dissent from the majority's refusal to address these constitutional issues because a review of the record reveals that the Union's due process and Article III arguments were not waived. If we properly reach the constitutional arguments presented by the Union, it is clear that the majority's failure to distinguish between the company's minimum funding obligation under the collective bargaining agreement and under ERISA thrusts the IRS into the unconstitutional role of determining the contract rights of private parties. Moreover, I cannot join the majority's holding that the IRS is the sole and final arbiter of public policy when determining whether to grant a waiver of the ERISA minimum funding requirement because making the IRS the sole and final judge of public policy denies the plan beneficiaries' due process rights to notice and an opportunity to be heard.
 
 I.
 
 16
 At the outset, I note that there were two sources of Keystone's annual funding obligation. Section 302 of ERISA (29 U.S.C. Sec. 1082) provides:
 
 
 17
 "(1) Every employee pension benefit plan subject to this part shall satisfy the minimum funding standard (or the alternative minimum funding standard under section 1085 of this title) for any plan year to which this part applies. A plan to which this part applies shall have satisfied the minimum funding standard for such plan for a plan year if as of the end of such plan year the plan does not have a cumulative funding deficiency."
 
 
 18
 ERISA's funding standards are enforced under provisions of the Internal Revenue Code. 26 U.S.C. Sec. 4971(a). If, as of the end of a plan year, there is an accumulated funding deficiency that has not been corrected within the taxable period, the employer will owe a 5% excise tax on the amount of the accumulated deficiency for each year in which the deficiency has not been corrected. Id. ("funding tax"). If a 5% excise tax is imposed upon an accumulated funding deficiency and the accumulated funding deficiency is not corrected within the taxable period, an additional tax equal to 100% of the accumulated funding deficiency that has not been corrected is imposed upon the employer, who is required to pay the initial tax. Id. at Sec. 4971(b). Neither the initial 5% excise tax nor the additional 100% tax is deductible for federal income tax purposes. Id. at Sec. 275(a)(6). When collective bargaining agreements are involved, the Internal Revenue Code provides:
 
 
 19
 "the liability under section 4971 [imposing the funding tax] of each employer who is a party to the collective bargaining agreement shall be determined in a reasonable manner not inconsistent with regulations prescribed by the Secretary--
 
 
 20
 (A) first on the basis of their respective delinquencies in meeting required employer contributions under the plan, and
 
 
 21
 (B) then on the basis of their respective liability for contributions under the plan."
 
 
 22
 Id. at 413(b)(6). An employer may avoid the funding tax by applying to the IRS for a waiver of the ERISA minimum funding obligation. 26 U.S.C. Sec. 412(d)(1). 29 U.S.C. Sec. 1083(a). To obtain a waiver of the ERISA minimum funding obligation, the employer must demonstrate
 
 
 23
 "(1) The employer is operating at an economic loss,
 
 
 24
 (2) There is substantial unemployment or underemployment in the trade or business and in the industry concerned,
 
 
 25
 (3) The sales and profits of the industry concerned are depressed or declining and,
 
 
 26
 (4) It is reasonable to expect that the plan will be continued only if the waiver is granted."
 
 
 27
 29 U.S.C. Sec. 1083(b). If the IRS grants the waiver, the company in subsequent years must contribute, "the amount necessary to amortize each waived funding deficiency (within the meaning of section 1083(c) of this title) for each prior plan year in equal annual installments (until fully amortized) over a period of 15 plan years." Id. at 1082(b)(2)(C).
 
 
 28
 In addition to the ERISA minimum funding obligation, an employer's annual contribution obligation may be contained in a collective bargaining agreement. 29 U.S.C. Sec. 186(c)(5-8). Article VI Sec. 2 of the Pension Agreement between Keystone and the Union recites in pertinent part: "The Company agrees to make contributions to the trust fund on an annual basis during the terms of the Agreement." When an annual funding obligation is contained in a collective bargaining agreement, ERISA provides:
 
 
 29
 "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."
 
 
 30
 29 U.S.C. Sec. 1145. The Supreme Court has interpreted the statutory phrase "to the extent not inconsistent with law" as meaning that courts will not enforce collectively bargained payment obligations that would "lead to" situations condemned by law, or that would allow a party to "reap the fruits" of illegal collective-bargaining provisions, such as violations of the Labor Management Relations Act, the antitrust laws, or the National Labor Relations Act. Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 86-88, 102 S.Ct. 851, 861-862, 70 L.Ed.2d 833 (1982). Neither the majority nor Keystone argues that the annual contribution obligation in the collective bargaining agreement violates the Labor Management Relations Act, the antitrust laws, or the National Labor Relations Act. With the exception of collectively bargained payment obligations that would lead to situations condemned by law or that would allow a party to reap the fruits of illegal collective bargaining provisions, an employer's failure to make a contribution agreed upon in a collective bargaining agreement violates ERISA. Winterrowd v. David Freeman and Co., 724 F.2d 823 (9th Cir.1984).
 
 
 31
 In December of 1980, without notifying the pension beneficiaries (hereinafter the "Union"), Keystone sought and obtained from the IRS a waiver of the ERISA minimum funding requirement. In its June 1981 summary annual report to the pension plan beneficiaries, Keystone revealed that the IRS had granted the waiver of the ERISA minimum funding requirement and that the employer had contributed nothing to the pension plan for the plan year from July 1, 1979 to June 30, 1980. The Union filed a grievance and after the grievance was submitted to an arbitrator, argued that Keystone's failure to make an annual contribution violated the Pension Agreement. The arbitrator agreed, holding: "The pension agreement was violated by the Company which is ordered to pay $2,147,932.00 to the pension fund with interest at 8% per annum from July 1, 1980, until paid."
 
 
 32
 The Union filed suit under Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, to enforce the arbitrator's award, contending that the award required immediate payment of the full amount. In its answer, Keystone construed the award as requiring payment in accordance with the IRS' grant of waiver of the ERISA minimum funding requirement--i.e., 15 years of equal installments plus interest. The parties filed cross-motions for summary judgment; the union contended that the amount was due immediately; Keystone argued that there was no cause of action because it was "willing to pay $2,147,932.00 to the pension fund with interest at 8% per annum from July 1, 1980 until paid...." The Union addressed this "case or controversy argument" in its "Memorandum of Law in Opposition to Defendant's Motion to Dismiss and/or for Summary Judgment." Keystone raised its public policy argument in its "Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment." The Union's reply brief to Keystone's Memorandum in Opposition to the summary judgment motion failed to raise its constitutional law issues (whether it was denied due process by not receiving notice and an opportunity to be heard before the IRS and whether the IRS impermissibly exercised Article III power in determining the contract rights of private parties).
 
 
 33
 The district court rejected Keystone's public policy argument, commenting that:
 
 
 34
 "Sections 302 and 303 of ERISA merely provide that where an employer cannot meet the minimum funding requirements set by ERISA without substantial business hardship, the Secretary of the Treasury may waive the funding requirements for that year, and the employer must repay the amount waived in equal payments over 15 years. This waiver, however, merely permits an employer experiencing financial difficulties to avoid payments to the pension fund and remain in compliance with the ERISA statutes. It sets the minimum standard for payments. It does not bar employers from undertaking greater contractual obligations, nor does any language in the statute relieve the employer from obligations which it has voluntarily undertaken by entering into a collective bargaining agreement."
 
 
 35
 Addressing the question of whether the Secretary's grant of a waiver of the ERISA minimum funding requirement is a finding that requiring payment of the ERISA funding amount would be adverse to the beneficiaries' interest, the district judge noted:
 
 
 36
 "The problem with that argument is that it makes the Secretary's finding on whether funding the plan would harm the employees determinative of whether the arbitrator's award is contrary to public policy. No written findings by the Secretary have been brought to this court showing the basis upon which the Secretary presumably concluded that funding the plan would be adverse to the interests of plan participants."
 
 
 37
 Because the district court judge found the arbitrator's decision unclear on the question of when the payment was to be made, he denied both parties' motions for summary judgment without prejudice and remanded the case to the arbitrator for clarification. The union was given leave to reinstate the case within 90 days if the arbitrator failed to rule or Keystone failed to comply with the arbitrator's order.
 
 
 38
 After the arbitrator issued a supplemental award ordering immediate payment, the Union moved the district court to reinstate its enforcement action and both parties renewed their motions for summary judgment. The Union raised its due process and Article III arguments in its Memorandum in Support of its Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment. The district court granted the Union's motion for summary judgment and denied Keystone's "[f]or the reasons set forth in [the] court's order of June 16, 1983 [remanding the case to the arbitrator]."
 
 A. Waiver of the Constitutional Issues
 
 39
 The majority holds in footnote 1 that the Union waived its argument that the IRS' grant of waiver of the ERISA minimum funding requirement was unconstitutional. According to the majority, the constitutionality arguments were waived because the Union failed to raise its constitutionality arguments in its reply brief in the first summary judgment motion. I believe this holding to be in error for several reasons.
 
 
 40
 First, a review of Fed.R.Civ.P. 56 reveals that it fails to mention supporting briefs or reply briefs; thus, in requiring parties to raise legal arguments in their reply briefs, the majority imposes a requirement that does not appear in the literal language of Rule 56. Secondly, the majority apparently assumes that the moving party will always have the opportunity to file a reply brief. To the contrary, the moving party may not have the opportunity to file a reply brief because opposing affidavits may, at the discretion of the court, be filed and received at the summary judgment hearing. 10A Wright, Miller and Kane, Federal Practice and Procedure, Sec. 2719 at 14. Thus, the moving party may be unaware of the full scope of the reply until the actual hearing of the motion. Finally, the majority overlooks both the fact that the district court denied the first motion for summary judgment without prejudice and the effect of a denial without prejudice on the parties' opportunity to raise additional issues. "A denial of a summary judgment motion is not a decision on the merits; it simply is a decision that there is a material factual issue to be tried." 10 Wright, Miller and Kane, Federal Practice and Procedure, Sec. 1712 at 587. "The denial of summary judgment does not preclude either party from raising at trial any of the issues dealt with on the motion." Id. Because the district court denied the motion for summary judgment without prejudice, it does not follow that the Union was precluded from raising the issue of whether the IRS' grant of waiver of the ERISA minimum funding requirements was constitutional. Thus, the majority's holding that the Union's constitutional arguments were waived is in error because the holding imposes a new procedural requirement (raising issues in a reply brief in a summary judgment motion) that is without support in the literal language of Rule 56 and overlooks the effect of the denial of a motion for summary judgment on the parties' opportunity to raise additional issues. Contrary to the majority's view, it was proper for the Union to raise its constitutional arguments in the second motion for summary judgment proceeding since the denial of the summary judgment motion without prejudice did not preclude the Union from raising the issue of the constitutionality of the IRS' procedure for waiving the ERISA minimum funding requirement.
 
 B. The Constitutional Questions
 
 41
 An examination of the majority's reasons, which are supported neither by case law nor statutory authority, reveals that its holding rests not only on the fairness and accuracy of the IRS determination of whether to waive the ERISA minimum funding requirement but also on the constitutionality of the role it imposes on the IRS. The majority begins its analysis by correctly noting that "the well-defined and dominant public policy embodied in ERISA [is] to protect plan participants from the unnecessary termination of their pension plans." The majority reasons that because the IRS found that Keystone faced a "substantial business hardship," the arbitrator's "refus[al] to permit Keystone to rely on the payment schedule outlined in ERISA's waiver provision ... jeopardized the continued existence of Keystone's pension plan, to the serious detriment of the plan participants." The majority concludes that because the arbitrator jeopardized the continued existence of the pension plan in refusing to allow Keystone to rely on the payment schedule outlined in the ERISA waiver provision, he violated public policy. There are several flaws in the majority's analysis. Initially, it is apparent that the majority's holding rests on the assumption that the IRS' determination was necessarily fair and accurate; on the other hand, if the IRS' determination to waive the ERISA minimum funding requirements was, in fact, inaccurate, the arbitrator did not violate public policy by requiring Keystone to make the annual contributions set forth in the Pension Agreement. Moreover, the majority's holding equates the contractual annual funding obligation under the pension agreement with the ERISA minimum funding requirement; in effect, if the IRS waives the ERISA minimum funding requirement, under the majority's holding, the contractual annual funding obligation under the pension agreement also is waived because an attempt to enforce the contractual obligation would be violative of public policy. Thus, under the majority's approach, the IRS' determination of the statutory requirements also determines the parties' rights under the contract (the pension agreement).
 
 
 42
 Before addressing the Union's constitutional arguments, I note that the statutory scheme for granting waivers of the ERISA minimum funding requirement does not appear to contemplate the waiver of separate contractual obligations to make annual contributions. The statute provides that the Secretary of the Treasury "may waive the requirements of section 1082(a) of this title " (emphasis added); the statute fails to specify that the Secretary may waive contractual funding requirements contained in pension agreements between private parties. Moreover, the application for the waiver is made by the employer and the statute fails to provide for giving notice or an opportunity to be heard to the beneficiaries. The statute requires the Secretary to consider whether:
 
 
 43
 "(1) The employer is operating at an economic loss,
 
 
 44
 (2) There is substantial unemployment or underemployment in the trade or business and in the industry concerned,
 
 
 45
 (3) The sales and profits of the industry concerned are depressed or declining and,
 
 
 46
 (4) It is reasonable to expect that the plan will be continued only if the waiver is granted."
 
 
 47
 29 U.S.C. Sec. 1083(b). However, the statute does not provide beneficiaries an opportunity to present evidence on these issues and the Secretary is not required to provide a written record in support of his decision. Indeed, the district court found: "No written findings by the Secretary have been brought to this court showing the basis upon which the Secretary presumably concluded that funding the plan would be adverse to the interest of plan participants." On the basis of this statutory scheme, I cannot conclude that Congress intended that the IRS' determination of the employer's obligations under ERISA be determinative of the contractual rights of private parties since the statute is structured to waive only the statutorily created right to minimum pension funding.
 
 
 48
 The Union raises two constitutional objections to the contention that the IRS' decision to waive the ERISA minimum funding requirements nullifies their contractual right to an annual contribution under the pension agreement. First, the Union contends that waiver of their contractual right to an annual contribution from Keystone without notice or an opportunity to be heard violates the Due Process Clause. Because the statute does not require the IRS to conduct a formal trial-type hearing in determining whether to grant a waiver of the ERISA minimum funding requirement, the decision whether to grant the waiver is more properly classified as an "informal" agency action. Although the applicable statutes and regulations may permit an agency to act informally, the agency's informal decision-making procedure may not violate the constitutional rights of those who will be adversely affected because an administrative decision that deprives a person of "life, liberty, or property, without due process of law" violates the Fifth Amendment. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In addressing a due process challenge to an informal agency decision based on the deprivation of a property interest, the court must determine:
 
 
 49
 "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
 
 
 50
 Mathews, 424 U.S. at 335, 96 S.Ct. at 903.
 
 
 51
 Applying the Mathews analysis, it is clear that under the majority's holding, the IRS' decision to grant a waiver of the ERISA minimum funding requirement also relieves the employer of his contractual obligation to make an annual contribution under the pension agreement because in the face of the IRS decision to grant the ERISA waiver, an attempt to enforce the contract would be violative of public policy. Since the IRS' decision deprives the beneficiaries of their contractual right to an annual contribution, the decision, in effect, impairs a constitutionally protected property interest. Because, under the majority's analysis, the IRS decision to waive the ERISA minimum funding requirement also waives the contractual minimum funding requirement, the IRS procedure for granting an ERISA minimum funding requirement must be examined to determine the risk of an erroneous deprivation of the contractual right to minimum funding; the probable value of additional or substitute safeguards; and, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. Mathews, 424 U.S. at 335, 96 S.Ct. at 903. In essence, the statute requires the Secretary of the Treasury to make two evidentiary determinations before granting a waiver of the ERISA minimum funding requirement: (1) the employer is facing a substantial business hardship and (2) that granting a waiver of the ERISA minimum funding requirement would be in the interest of the plan participants. See, 29 U.S.C. Sec. 1083(b). If the IRS grants the waiver, the company must, in subsequent years, contribute, "the amount necessary to amortize each waived funding deficiency (within the meaning of section 1083(c) of this title) for each prior plan year in equal annual installments (until fully amortized) over a period of 15 plan years." Id. at 1082(b)(2)(C). In the instant case, the IRS' grant of a waiver of the ERISA minimum funding requirement stated:
 
 
 52
 "The information submitted with the request and at an informal conference shows that the Company has suffered a substantial loss for the Company's fiscal year ended June 30, 1980, for a variety of reasons, most of which relate to serious downturns in the industries to which it sells its products, including the automotive industry, housing and agriculture. Further, the Company continues to experience a serious problem maintaining a sufficient amount of working capital to prevent technical default under its prime loan obligations.
 
 
 53
 The Company has nevertheless managed to continue its modernization program so that it can be positioned to take best advantage of turnarounds in the industry it serves. The Company has also pared costs and has reduced future benefit accruals under one of the largest pension plans it maintains. For these reasons, we believe the Company can recover from its present hardship and have therefore granted these waivers."
 
 
 54
 An analysis of these reasons reveals that although some of the facts on which the IRS relied may not be subject to serious dispute (i.e.,--"the downturns in the industries to which it sells its products"), other factual findings could be the subject of vigorous debate (i.e.,--whether the company "has ... managed to continue its modernization program so that it can be positioned to take best advantage of turnarounds in the industry it serves" and whether "the Company can recover from its present hardship."). Moreover, under the majority's analysis, the government's interest in making a fair and accurate determination of whether to grant a temporary waiver of the ERISA minimum funding requirement has been expanded to include an interest in making a fair and accurate determination of whether to grant a temporary waiver of the contract's minimum funding requirement. I cannot join the majority's holding that the beneficiaries' contract rights can be nullified by an IRS ERISA minimum funding waiver determination without granting the beneficiaries, who have a contractual right to an annual contribution from the company, the right to notice and an opportunity to be heard on the questions of whether the employer actually faces a substantial business hardship and whether a waiver of the minimum funding requirement in the Pension Agreement would be in the best interest of the pension beneficiaries.
 
 
 55
 As a second constitutional objection, the Union directs our attention to the following passage in Northern Pipeline Construction Co. v. Marathon Pipeline Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982):
 
 
 56
 "A matter of public rights must at a minimum arise 'between the government and others'.... In contrast, the liability of one individual to another under the law as defined ... is a matter of private rights. Our precedents clearly establish that only controversies in the former category may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination.... Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power."
 
 
 57
 458 U.S. at 69-70, 102 S.Ct. at 2870-71 (emphasis in original). The plurality in the Marathon decision held that the principle of separation of powers embodied in Article III permits legislative courts (non-Article III courts) in three situations: (1) territorial courts; (2) courts-marshals; (3) legislative courts and agencies established to enforce "public rights." The plurality defined "public rights" as "matters arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.' " Marathon, 458 U.S. at 67-8, 102 S.Ct. at 2869. The Supreme Court stated that no case arising between two individuals could be characterized as one of public rights. Id. at 68-72, 102 S.Ct. at 2869-72. Although the Marathon decision addressed the constitutionality of bankruptcy courts, courts have applied it to administrative agencies, see, e.g., Kalaris v. Donovan, 697 F.2d 376 (D.C.Cir.1983), and commentators agree that the decision may be applied to administrative agencies if an agency adjudication attempts to resolve private rights. See, e.g., Forward--The Supreme Court, 1981 Term, 96 Harv.L.Rev. 257-68 (1982); Redish, Legislative Courts, Administrative Agencies, and the Northern Pipeline Case Decision, 1983 Duke L.J. 197 (1983). An " 'adjudication' means agency process for the formulation of an order." 5 U.S.C. Sec. 551(7). An " 'order' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule-making but including licensing." Id. at (6). Because the IRS' grant of a temporary waiver of the ERISA minimum funding requirement is "a final disposition of an agency matter other than rule making," it is an adjudication; the IRS acts in a judicial function when determining whether to grant a waiver of the ERISA minimum funding requirement. Under the majority's holding the IRS' decision to grant a temporary waiver of the ERISA minimum funding requirement nullifies the beneficiaries' contract right to an annual contribution because an attempt to enforce the contract right would be violative of public policy; in effect, under the majority's holding the IRS determines contract rights between private parties, i.e., whether an attempt to enforce the contract right to an annual contribution would violate public policy. Thus, under the majority's analysis, the IRS impermissibly wields Article III power because it determines the contract rights in a dispute between private parties.
 
 
 58
 The majority's failure to acknowledge these constitutional problems may, in part, be caused by its failure to examine separately the two sources of Keystone's obligation to make an annual contribution to the pension plan, ERISA and the pension agreement. Because the majority holds in footnote 3 that Keystone did not waive its right to seek an ERISA waiver from the IRS, it appears to hold that the contract incorporates ERISA and that the minimum funding requirement in the contract is the same as the ERISA minimum funding requirement. Although I do not quarrel with the holding that a pension contract incorporates ERISA regulations that Congress intended to be immune from contractual waiver,[1] I am unable to conclude from that fact that the annual funding obligation in the contract will always be the same as the ERISA minimum funding requirement. First, an examination of the funding section of the pension agreement in this litigation reveals that the company contribution was to be made in accordance with a funding schedule set out in the contract; the contract, which was modified and reaffirmed following the passage of ERISA, fails to mention ERISA in the funding section. Secondly, as the district court correctly noted, employers are free to contract to contribute more than the ERISA minimum funding requirement. Thus, the employer's obligations are separate and independent. But, by assuming that the contract requirement of an annual contribution is the same as the ERISA minimum funding requirement, the majority places the IRS in the position of determining the contract rights of private parties when it decides whether to grant a waiver of the ERISA minimum funding requirement. As a result, under the majority's approach (equating the contractual minimum funding requirement with the ERISA minimum funding requirement), the IRS wields Article III power in determining the contract rights between private parties.
 
 
 59
 Indeed, the majority's failure to acknowledge the separate contractual minimum funding obligation causes them to fail to appreciate the due process implications of their decision. The majority reasoned that because the IRS found that Keystone faced a "substantial business hardship," the arbitrator's "refus[al] to permit Keystone to rely on the payment schedule outlined in ERISA's waiver provision ... jeopardized the continued existence of Keystone's pension plan, to the serious detriment of the plan participants." The majority concludes that because the arbitrator jeopardized the continued existence of the pension plan in refusing to allow Keystone to rely on the payment schedule outlined in the ERISA waiver provision, he violated public policy. In effect, the majority expands the Supreme Court's definition of "to the extent not inconsistent with law," in 29 U.S.C. Sec. 1145 to include a public policy defense based upon the IRS' decision to grant a waiver of the ERISA minimum funding requirement. However, if the IRS' determination that the ERISA minimum funding requirement should be waived for a definite period of time not to exceed fifteen years provides the employer with an unreviewable public policy defense against its contractual obligation, the beneficiaries' contract rights have been impaired without their having notice or an opportunity to be heard by the IRS. Thus, the role of sole and final arbiter of public policy that the majority thrusts on the IRS exposes the IRS' ERISA minimum funding waiver determinations to due process attack under Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
 
 
 60
 To avoid casting doubt on the constitutionality of the IRS ERISA minimum funding requirement waiver procedure, I regard the employer's two sources of obligations to make a contribution (ERISA and the pension agreement) as separate and distinct. While the IRS has the final authority to temporarily waive the ERISA obligation, its determination to waive this statutory obligation has no effect on the employer's contractual obligation to make an annual contribution. Thus, I find that the relationship between the IRS' procedure for waiving the ERISA minimum funding requirement and the collective bargaining agreement is analogous to the relationship between the Equal Employment Opportunity Commission and collective bargaining agreements:
 
 
 61
 "Absent a judicial determination, the commission [EEOC], not to mention the Company, cannot alter the collective bargaining agreement without the Union's consent. Permitting such a result would undermine the federal labor policy that parties to a collective bargaining agreement must have reasonable assurance that their contract will be honored."
 
 
 62
 W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 103 S.Ct. 2177, 2186, 76 L.Ed.2d 298 (1983); see also, 126 Cong.Rec., at 20180 (remarks of Sen. Williams) ("It is essential to the financial health of multiemployer plans that they and their actuaries be able to rely on an employer's contribution promises. [P]lan participants for whom the employer promises to make pension contributions to the plan in exchange for their labor are entitled to rely on their employer's promises."). In my view, the Supreme Court's well reasoned decision in Grace requires us to hold that neither the company nor the IRS could alter the collective bargaining agreement without the beneficiaries' consent.
 
 
 63
 Because the majority places the IRS ERISA minimum funding requirement waiver procedure in constitutional jeopardy, I dissent.
 
 
 
 *
 The Honorable William J. Jameson, Senior District Judge for the District of Montana, is sitting by designation
 
 
 [1]
 In its brief before this court, the Union makes a half-hearted attempt to argue that because the IRS granted the section 303 waiver to Keystone without giving the plan participants or the Union any notice or an opportunity to appear at a hearing and without issuing any written findings, the employer's receipt of an ex parte waiver from the IRS violated the Union's Fifth Amendment right to due process. The Union also makes a vague argument that the IRS had no power to grant the waiver because it is an Article I agency and not an Article III court, and thus that it cannot resolve private contractual disputes affecting private rights
 We decline to review these arguments because the Union failed to raise them before the district court decided the issue to which they were addressed. See Stern v. United States Gypsum, Inc., 547 F.2d 1329, 1333 (7th Cir.), cert. denied, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). Prior to the June 16, 1983 decision issued by the district court, the Union submitted the following three memoranda of law: one in support of its motion for summary judgment, one in opposition to defendant's motion to dismiss and/or for summary judgment, and one in reply to defendant's opposition to plaintiffs' motion for summary judgment. Although Keystone focused directly on ERISA's waiver provision in arguing that public policy would be contravened if the arbitrator's award was interpreted to require immediate payment, the Union never raised its due process or Article I/Article III arguments in response.
 On June 16, 1983, the district court rendered a detailed opinion concluding that enforcement of the arbitrator's award requiring immediate payment would not violate public policy. The Union did not raise the above-mentioned additional arguments until September 1983. Presumably because it had already decided the issue, the district court did not issue an additional opinion in granting the Union's motion for summary judgment, but rather cited its June 16, 1983 decision. The Union's insertion of additional arguments after the district court rendered a decision on the pertinent issue, therefore, amounts to nothing more than an attempt to preserve its post-hoc rationalizations for appeal. Moreover, the posture of this case leads us to emphasize the litigant's duty to raise its arguments at the first opportunity. While we are not unmindful of the literal reading accorded pleadings under the Federal Rules of Civil Procedure, the limited role of district courts in the arbitration setting contributes to our conclusion that the Union has waived its right to present these arguments to this court.
 
 
 [2]
 Keystone administered a total of twenty pension plans. The grave financial situation facing Keystone when it applied for the waiver on the pension plan at issue here is revealed by the fact that Keystone had already taken steps to terminate three of its nineteen other pension plans. In addition, the waiver that the IRS granted Keystone covered the remaining sixteen pension plans administered by Keystone
 
 
 [3]
 One could argue that the safeguards embodied in section 303 of ERISA were waived by the parties to the pension plan agreement. We note, however, that the language in the pension agreement in the present case requiring an employer to make annual contributions to the pension plan was first included in the 1968-1971 pension agreement (and has been included in every subsequent pension agreement), which was before ERISA was even enacted. Furthermore, in order for a contract to waive a statutory right, the Supreme Court has held that the general contractual provision must clearly, explicitly, and unmistakably waive the right. Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). Since ERISA was not even enacted when the annual contribution provision of the present pension plan was first drafted and since the provision does not explicitly waive Keystone's right to obtain a variance from the annual contribution requirement, we find that the safeguards embodied in section 303 were not waived and should have been applied. We decline to decide whether an arbitrator's award enforcing a pension agreement that clearly waives an employer's right under ERISA to obtain a variance from the annual contribution requirement would violate public policy
 
 
 [1]
 In addition to my point that the minimum funding requirement contained in the contract does not invariably equal the ERISA minimum funding requirement because the parties are free to contract for a greater minimum funding than ERISA requires, I cannot join the reasoning contained in footnote 3 of the majority opinion. The majority apparently holds that Keystone did not waive its right to seek a waiver of the ERISA minimum funding requirement because the contract term, which was drafted before ERISA was enacted, failed to, "explicitly waive Keystone's right to obtain a variance from the annual contribution requirement...." I fail to understand how parties can explicitly waive rights granted by a statute that has not been enacted at the time the contract was drafted, much less agreed to