**WYMAN–GORDON COMPANY, a Massachusetts Corporation Doing Business in the State of Illinois, Plaintiff,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO and its Local Union, Local Union No. 3669, Labor Organizations, Defendants.**

Nos. 85 C 0102/85 C 360.

United States District Court,
N.D. Illinois, E.D.

June 13, 1985.

Gerald C. Peterson, Winston and Strawn, Chicago, Ill., for plaintiff.

David L. Gore, Kleiman & Whitney, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Wyman-Gordon Company ("the Company") filed this suit under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, seeking to vacate an arbitration decision ordering the Company to reinstate employee Ronald Brown ("Brown") with full seniority, benefits and back pay of about $30,000. The Company had fired Brown for collecting unemployment benefits while working for and drawing a salary from the Company. The defendant Union ("the Union") grieved the firing, which ultimately led to the arbitration decision favoring the Union. The parties have filed cross-motions for summary judgment. The material facts are undisputed. For the reasons stated below, the Court grants the Union's motion and denies the Company's.

### I.

The Company manufactures steel forgings, including crankshafts for the auto and farm implement industries. During the severe 1982 recession, it laid off about half of its hourly workforce of over 900. On September 5, 1982, it closed its Harvey, Illinois, plant, laying off the remaining workers, including Brown. Brown and others filed for and received unemployment compensation from the State of Illinois.

The Company recalled Brown from September 14 through October 17 and then laid him off again until November 29, when he was recalled for good. Brown had certified to the State that he was unemployed even during his period of recall. He thereby collected six weeks of benefits unlawfully. Brown was not the only worker to do so. After an investigation in March 1983, the Company learned that thirty-eight employees had received one or more weeks of unlawful benefits. It decided not to discipline employees who received excess benefits for only two weeks or less, because such employees could have received their benefits through some error. But to receive benefits for three or more weeks, an employee must have certified to the State at least twice that he or she was not working. The Company decided to fire the nine workers who fell into this group. The Union grieved each of the nine discharges under the relevant Collective Bargaining Agreement.

Because the grievances involved many common issues, the Union asked the Company to agree to arbitrate all nine before one arbitrator, but the Company refused.[1] In March 1984, Arbitrator Dolnick heard the first case, involving another employee. The issue, as in the Brown arbitration, was whether the Company had "just cause" to fire the employee for unlawfully receiving unemployment benefits, and if not, what the proper remedy was. Arbitrator Dolnick ruled that the Company had just cause under the Collective Bargaining Agreement ("Agreement") to fire that employee. That Agreement provides that:

> In discipline and discharge cases, the arbitrator shall have the right to change the degree, type or method of discipline or discharge as the equities of each discipline or discharge case may require.

\*　　\*　　\*　　\*　　\*　　\*

---

1. The Company claims that, with one historical exception, its past practice with the Union has been to arbitrate all cases separately. It says that Article XVI of the Collective Bargaining

Agreement compels this result. We see no language in the Article compelling this result. So far as we can tell, the Company was free to

The decision of the arbitrator shall be final, conclusive, and binding on both parties for the life of this Agreement.[2] The Union did not challenge Arbitrator Dolnick's decision.

The Company fared worse in grievance two, also involving an employee other than Brown. Arbitrator Wolff found that the Company lacked just cause for firing that employee. Although he distinguished Arbitrator Dolnick's decision, Arbitrator Wolff also expressly disagreed with it and rejected the Company's argument that principles of *stare decisis* or *res judicata* apply to arbitrations. The Company disagrees with this decision, but abided by it.

The Company then lost its second in a row in arbitration three, the one involving Brown. In a twenty-five page opinion, Arbitrator Goldstein ruled that the Company lacked just cause to fire Brown. As a remedy, he ordered that Brown be reinstated with back pay, benefits and seniority. Agreeing with Arbitrator Wolff, Arbitrator Goldstein also rejected notions of *stare decisis* and *res judicata,* and declined to follow Arbitrator Dolnick's decision.

The Company has reinstated Brown, but refuses to comply with the rest of the decision.[3] In this suit to vacate the award, the Company makes essentially three arguments. Most significantly, it argues that the arbitrator's decision violated Illinois' clear public policy forbidding fraudulent collection of unemployment benefits. It also complains that the arbitrator read a "subjective intent" requirement into the "just cause" clause and thus modified the clause. Finally, the Company argues that the Collective Bargaining Agreement re-

quired Arbitrator Goldstein to follow Arbitrator Dolnick's decision. Below we reject each of these contentions.

## II.

▇ Federal courts are not arbiters of labor arbitrators' decisions. The well-established case law holds that arbitrators have great leeway to make even wrong decisions, that is, decisions a reviewing court might disagree with. The Supreme Court defined the Court's narrow scope of review in the *Steelworkers' Trilogy.*[4] When labor and management submit a question of contract interpretation to an arbitrator, the Court's review "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *Steelworkers v. American Mfg. Co.,* 363 U.S. at 568, 80 S.Ct. at 1346. Courts "have no business weighing the merits" of the dispute, *id.,* because in the labor relations context, arbitration replaces and quells strife. Arbitration is "part and parcel of the collective bargaining process itself." *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. at 578, 80 S.Ct. at 1350. But while the court has a highly deferential role, its mission is not merely to rubber stamp an arbitrator's ruling mindlessly. The arbitrator has great freedom only when interpreting and applying the collective bargaining agreement:

[H]e does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infi-

---

agree to arbitrate all nine cases in one hearing, despite its past practice.

**2.** The Agreement also codifies the general rule that the arbitrator is constrained to interpret and apply the Agreement as written:

The arbitrator shall have no power to add to, nor subtract from, nor modify any of the terms of this Agreement of any supplements to this Agreement specifically referred to herein.

Agreement, Art. XVI.

**3.** In light of its agreement to reinstate Brown, it is not clear to us whether the Company is chal-

lenging only the part of the decision awarding back pay and benefits, or whether it continues to want to fire Brown as well. The result we reach makes this doubt immaterial.

**4.** *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

delity to this obligation, courts have no choice but to refuse enforcement of the award.

*Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361; *see also Young Radiator Co. v. International Union, U.A.W.*, 734 F.2d 321, 323–24 (7t Cir.1984). With our limited mission thus defined, we turn to the merits.

### III.

Of the Company's three arguments, only the "public policy" one is strong. We will deal with the two weaker arguments before addressing that one.

### A.

We first reject the Company's argument that Arbitrator Goldstein was bound by Arbitrator Dolnick's decision upholding a discharge. It essentially argues that the arbitrator was bound by *stare decisis*, or, more precisely, by the principle of defensive collateral estoppel. Both Arbitrators Wolff and Goldstein rejected this argument.

■ Courts have held that arbitrators are not bound by arbitral precedent. *Derwin v. General Dynamics Corp.*, 719 F.2d 484, 491 (1st Cir.1983); *Courier-Citizen v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 280 (1st Cir.1983); *Metropolitan Edison Co. v. N.L.R.B.*, 663 F.2d 478, 483 (3d Cir.1981), *aff'd*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983); *Westinghouse Elevators v. S.T.U. de Puerto Rico*, 583 F.2d 1184, 1187 (1st Cir.1978); *United Electrical Radio and Machine Workers v. Honeywell, Inc.*, 522 F.2d 1221, 1228 (7th Cir.1975) (*res judicata* applies only where there exists strict factual identity). Arbitrator Wolff aptly stated the reason for this rule:

The purpose served in preclusion ... in the legal setting is really at war with a central purpose of the grievance arbitration machinery of the collective bargaining agreement. The latter is intended in large measure as a safety valve or catharsis for the individual grievant's pent-up emotions frequently attendant upon the industrial scene. It is also ordinarily a *quid pro quo* for the barring of resorting to economic sanctions by the parties during the contract term. If a current grievance must be denied merely because a similar one was ruled upon previously by an arbitrator, ill-will may fester to the detriment of all parties.

Wolff Decision at 18–19. He also cited extensive arbitral authority stating this rule. The Company has cited no contrary authority to this Court.[5]

■ One exception to this rule applies where the parties contractually agree that *stare decisis* should apply. *See, e.g., Courier-Citizen*, 702 F.2d at 280. At the outset, we observe that by refusing the Union's request to hear the nine grievances at once, the Company surely indicated that the hearings should be independent. As Arbitrator Goldstein wrote, the Company wanted "nine chews at the apple." We doubt that if the Company had lost the first hearing it would have sung the virtues of precedent in the next hearing. Indeed, it did not sing the virtues of Arbitrator Wolff's precedent. In any event, we do not think the Agreement creates a rule of *stare decisis*.[6] The Company points only to the clause which makes "[t]he decision of the arbitrator ... final, conclusive, and binding on both parties for the life of this Agreement." This clause certainly does not expressly create a rule of *stare decisis* or issue preclusion. Indeed, we think the plain meaning of this typical clause is that the decision of an arbitrator concerning

---

**5.** Instead, the Company ignores the extensive arbitral authority rejecting *stare decisis* and distinguishes the cases we have cited above. The Company is correct that those cases did not involve arbitration cases with as close a similarity as the ones here. But the rule stated in those cases—that arbitral precedent is persuasive authority at most—applies here.

**6.** In light of this conclusion that the Agreement does not mandate *stare decisis*, we need not examine whether the Company's decision to sever the nine hearings somehow waived any such provision.

*any one grievance* is final and binding. Thus, the Union abided by Arbitrator Dolnick's ruling, and the Company abided by Arbitrator Wolff's ruling. Each ruling was binding as to the employee at issue in each. But each ruling did not necessarily bind later arbitrators confronted with similar facts. The most that can be said in the Company's favor is that the clause is arguably ambiguous. Even if it is, we are to resolve ambiguities in contract construction in favor of the arbitrator's result. We cannot say that the decisions of two arbitrators rejecting *stare decisis* failed to "draw their essence" from the Agreement or were manifestly unfaithful to the Agreement.[7]

### B.

The Company also challenges Arbitrator Goldstein's conclusion that the Company lacked "just cause" to fire Brown within the meaning of the Agreement. This is clearly a question of interpretation and application of the Agreement. We cannot substitute our opinion for that of the arbitrator's. *American Mfg.*, 363 U.S. at 568, 80 S.Ct. at 1346. As noted earlier, we need only decide whether the decision "draws its essence" from the Agreement.

The Agreement does not define "just cause." Nor does it specifically prohibit dishonesty of the sort involved here. The specific question for the Arbitrator was whether Brown's unlawful receipt of unemployment benefits constituted "just cause." In ruling "no," the Arbitrator made several findings. First, he decided that the facts before him did not support the Company's claim that Brown had intended to defraud *the Company*. The Company does not seriously challenge this factual finding here.[8] Second, he rejected the Company's argument that it had suffered actual harm from Brown's misconduct. Distilled to its essentials, the argument states that the Company, like other employers, finances unemployment benefits. *See* Ill.Rev.Stat. ch. 48, §§ 300 *et seq.* (1983). The Company's contribution rate depends on its unemployment history. As a general proposition, because the program is one of "insurance," a company must contribute more when it has a history of unemployment. The Arbitrator agreed with this argument in theory, but ruled that its application to the Brown case was speculative. The Company had not shown concretely that Brown's transgressions led to any real increase in the Company's contribution rate. Arbitrator Wolff had reached the same conclusion.[9]

Next, Arbitrator Goldstein rejected the Company's arguments that it had a longstanding practice of discharging employees for dishonesty. Both he and Arbitrator Wolff indicated that they would support such a policy if it existed. *See* Goldstein Decision at 23 & n. 11; Wolff Decision at 27. But both held that the evidence did not show that the Company had such a policy when the workers collected their excess benefits. The only evidence each found was a letter dated January 18, 1983, *after* the frauds were committed, stating that fraudulent receipt of benefits would be disciplined. Both held that the concept of "just cause" does not by itself encompass

---

7. We note that Arbitrator Goldstein did not ignore precedent. He did consider the Dolnick decision. Further, he was presented with two, conflicting decisions and chose the one he thought was better. No matter what he did, he would have been unfaithful to one precedent. The Company created this conflict by not agreeing to have one hearing, so its arguments concerning precedent ring hollow.

8. As noted below, the Company challenges the relevance of the finding, but not its accuracy. A challenge to accuracy would have been fruitless, given our broad deference to arbitrators' findings of fact.

9. Arbitrator Wolff also noted that the Union had offered to reimburse the Company to the extent its rates went up because of the workers' misconduct. Arbitrator Goldstein did not mention this fact about the Union, but Arbitrator Wolff did, Wolff Decision at 12 n.* & 24, and the former expressly adopted the reasoning and approach of the latter. Goldstein Decision at 23. In any event, since the State knew of the error, there is no reason to expect it would raise the Company's rates. *See* Wolff Decision at 24. We cannot say that either Arbitrator's treatment of these facts was arbitrary.

such general dishonesty that works no harm on the Company. We cannot say that this conclusion was manifestly unfaithful to the Agreement.

We reject the Company's attempt to prove anew in this Court that it had a clear past policy and practice of discharging employees for dishonesty. We do not sit in review of arbitrator's factual findings, unless they lack any support, which they do not. *Amalgamated Meat Cutters v. Great Western Food Co.*, 712 F.2d 122, 123 (5th Cir.1983). Also, under the *Steelworkers' Trilogy*, we must defer to the Arbitrators' reading of the "just cause" provision, regardless of whether we would have acted differently. We see nothing in the Agreement which clearly compels a contrary result. To the contrary, the Agreement expressly grants the arbitrator in discharge cases "the right to change the degree, type or method of discipline or discharge as the equities of each ... case may require." The Company may disagree with the equities, but that is unavailing. Nor would it matter if we disagreed with the arbitrator's view of the equities. Since we hold that the arbitrator's words did not manifest an infidelity to the Agreement, our view of the merits is irrelevant.

The Company argues that the "just cause" standard is an objective one, and that a "reasonable person" would necessarily find that Brown's dishonesty was just cause for the dismissal. Even assuming some objective standards applies, we do not believe the Arbitrator's conclusion was unreasonable or subjective.[10] It is significant that the Arbitrator found as facts that Brown did not intend to defraud the Company, that the company was not harmed, and that the company had no previous policy punishing dishonesty of this sort. On balance, the arbitrator could reasonably conclude that discharge was too severe a sanction for the harm done, especially when the employee had no notice that his transgression would subject him to discipline. The Arbitrator also reasonably took into account the facts that Brown had offered to reimburse the State, and the Union offered to reimburse the Company if its rates went up.

That the Arbitrator looked to Brown's lack of subjective intent to harm the Company does not mean he failed to use an objective approach to "just cause." A reasonable person would want to know what Brown intended and then "objectively" weigh that intent against all of the other relevant factors in deciding whether "just cause" existed. *Young Radiator*, relied upon by the Company, does not compel a different result. There the employer fired an employee for theft of company property. The arbitrator found that the employer lacked "just cause" because the theft was not the employer's "motivating cause" for the discharge. The Seventh Circuit held that this finding ignored the collective bargaining agreement, which specifically authorized theft as a "just cause" for discharge. 734 F.2d at 324. In contrast, the Agreement here is silent about Brown's type of misconduct. Also, the employer in *Young* was harmed in fact, unlike here. Finally, the Company misreads *Young's* treatment of the *employer's* "motivating cause" as a bar on consideration of the *employee's* motivations in this case. The Court reasoned that whether an arbitrator cannot look to an *employer's* real motivations for a discharge is separate from "just cause" as defined in a collective bargaining agreement. But an *employee's* motivation for doing the acts he is accused of *is* highly relevant to an objective determination of whether an employee should be disciplined, and if so, how.

### C.

◼ The Company's strongest contention is that the arbitrator's decision violates public policy. Before detailing that argument, we shall first clarify the issue by

---

10. Our function here is not to decide what the *best* course of action would have been. Arguably, reinstatement with some reduction of benefits could have been *more* reasonable. But we sit here to decide whether the course taken was wholly unreasonable or arbitrary, not whether it was the most reasonable one.

describing what it does not entail. The question is not whether Brown's conduct violated public policy. It surely did. Nor is the question whether a discharge would have *better* served public policy than reinstatement. We express no opinion on that question. The question is whether the decision to reinstate Brown with full benefits, seniority and back pay actually violated public policy.

Our review of this question is not as deferential as was our review above. If the "just cause" provision, as interpreted and applied by the Arbitrator, violates some public policy, "we are obliged to refrain from enforcing it." *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 765, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). This question is ultimately one for the Court, as well as the arbitrator. *Id.; see also Amalgamated Meat Cutters v. Great Western Food Co.*, 712 F.2d 122, 124 (5th Cir.1983); *Local No. P-1236 v. Jones Dairy Farm*, 680 F.2d 1142, 1144–45 (7th Cir.1982); *International Ass'n of Machinists v. Campbell Soup Co.*, 406 F.2d 1223, 1227 (7th Cir.), *cert. denied*, 396 U.S. 820, 90 S.Ct. 57, 24 L.Ed.2d 70 (1969). To be given effect, the public policy must be clearly defined. *See W.R. Grace*, 461 U.S. at 765, 103 S.Ct. at 2183; *Jones Dairy*, 680 F.2d at 1145. And we must be extremely cautious about setting aside an arbitration award because of public policy. *Meat Cutters*, 712 F.2d at 124.

The public policy here is clear. Illinois outlaws false claims of unemployment benefits. Ill.Rev.Stat. ch. 48, § 491 (1983). The Company is correct that the State has a strong interest in protecting the integrity of its unemployment compensation system and in preventing fraud to that system. But it does not necessarily follow that the reinstatement of Brown runs afoul of that policy. Just because Brown himself violated public policy does not mean an arbitrator's decision not to let the Company fire him also violates public policy.

The Arbitrator found that Brown had offered to make the State whole for its losses. The State has apparently decided not to prosecute. There is no evidence that Brown is a recidivist. These facts suggest that discharge is not the only fair result. Criminal law, for example, does not mandate that a person be punished severely for every crime he commits, let alone the first one. Other interests, such as restitution and rehabilitation, figure into the calculus of what vindicates the public interest when a crime is committed. In sum, it was not necessary to serve public policy that Brown be fired or even that he be denied back pay.[11] It is at least arguable that the public interest was served enough in this case by the offer of restitution and the rehabilitative effects of the continued employment. And the public interests of deterrence are served by the Company's now-established policy forbidding such dishonesty, as well as the State's criminal code. This is not to say that discharge, or at least a denial of back pay or some benefits, would not have also served the public interest. *Cf. Kane Gas, Light & Heating v. International Brotherhood of Firemen*, 687 F.2d 673, 682 (3d Cir.1982) (public interest vindicated by sanctions of suspension rather than discharge). All we say is that the course taken did not clearly violate public policy. Whether it was the best course is not the Court's concern.

*Campbell Soup, supra,* supports this result. Campbell's fired a worker for gambling at the plant. He had pleaded guilty to a misdemeanor violation of an Illinois gambling law, was fined $1,000 and sen-

---

11. Under the Company's logic, it, instead of the State, serves as ultimate vindicator of the public interest. It chose not to fire about thirty employees who received benefits unlawfully. While we commend the Company for giving these employees the benefit of the doubt, it is likely that at least a few of these employees filed a false form intentionally. Yet the Company would not argue, we think, that it violated public policy by not disciplining these employees. Similarly, we do not think the Company would feel it had violated public policy if it had decided to warn rather than fire Brown. Also along those lines, if the State decided that the public interest did not warrant prosecution, we do not see why that public interest would necessarily warrant punishment meted out by the Company.

tenced to probation for a year. There, unlike here, a specific company rule called for firing an employee for violating a penal law on the premises. The arbitrator reinstated the worker without back pay. The Seventh Circuit held that this remedy was within the arbitrator's broad remedial power. 406 F.2d at 1226–27. It also held that the reinstatement did not violate public policy. It noted that the conviction and fine vindicated the gambling law at issue, and that the public policy of rehabilitation overrode an automatic policy of precluding reinstatement of one convicted.

The Company correctly observes that the arbitrator in *Campbell's* denied back pay, and the worker had paid a fine. Thus, the worker there had been punished, and the public policy against gambling had been vindicated. Here, argues the Company, Brown has not been convicted, has not been punished and is getting full back pay to boot. Thus, the Unemployment Compensation Act has not been vindicated, concludes the Company. We do not agree that *Campbell's* implies any sort of "conviction" requirement. The case clearly states that other interests are relevant besides the penal statute at issue—the federal policy of industrial peace and the State policy of rehabilitation. *Id.* at 1227. As noted above, those policies were served here by the reinstatement, as well as by the policy of restitution. And given the continued deterrence of the penal statute, now combined with a clearly defined company policy, the likelihood of a repeat offense is diminished. In sum, we do not agree with the Company that this arbitration decision will signal to other employees that they can cheat on benefits without risk. Thus, we also do not believe that upholding this decision amounts to "a judicial condonation of a criminal act." *Kane Gas*, 687 F.2d at 682.

The principal cases which did vacate arbitration decisions on public policy grounds do not compel a similar result here. In *Local No. P-1236 v. Jones Dairy Farm*, 680 F.2d 1142 (7th Cir.1982), the Court vacated the arbitrator's decision to uphold a rule in a meat-packing plant which had completely forbade workers from ever re-

porting unsanitary conditions to government inspectors. Unlike the ruling in the present case, the arbitrator's ruling in *Jones Dairy* had serious future consequences: in no uncertain terms it directly threatened public health. Here, the arbitrator's decision poses no direct, certain danger to the Illinois unemployment compensation scheme. Future violations are still deterred by statute and company rule and restitution has been offered for past harm. Similarly, the arbitrator's decision in *Meat Cutters, supra*, entailed serious threat of harm to public safety. The arbitrator had reinstated a truck driver who had gotten into a serious accident while driving drunk. The Court vacated the decision on the basis of the clear public policy of preventing drunk driving. Obviously, discharge in that case served a vital prophylactic purpose. Professional drivers must not drink on the job. Here, the public danger is less severe and the need for a prophylactic ruling less compelling. As noted above, deterrents are already in place. And even if Brown repeated his offense, the harm to the public would not be irreparable. A death caused by drunk driving, however, would be irreparable.

## IV.

We conclude, then, that the Arbitrator's decision should stand. This result does not mean we disagree wholly with all the contentions of the Company. Like the Arbitrators, we think the Company had a right to create prospectively its rule against dishonesty. We also agree that benefits fraud is serious. But we cannot agree that the Arbitrator's decision failed to draw its essence from the Collective Bargaining Agreement or manifestly violated public policy. Accordingly, we grant the Union's motion for summary judgment and deny the Company's. It is so ordered.