**E.I. DuPONT de NEMOURS AND CO.,**
**Plaintiff-Appellee,**

v.

**GRASSELLI EMPLOYEES INDEPENDENT ASSOC. OF EAST CHICAGO,**
**INC., Defendant-Appellant.**

No. 85–1577.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1985.

Decided May 9, 1986.

Barry A. Macey, Segal & Macey, Indianapolis, Ind., for defendant-appellant.

Ronald J. Hein, Matkov, Griffin, Parsons, Salzman & Madoff, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, POSNER and EASTERBROOK, Circuit Judges.

CUMMINGS, Chief Judge.

This appeal comes to us from a decision by the district court to deny a motion by defendant Grasselli Employees Independent Association of East Chicago, Inc. ("defendant") to enforce an arbitrator's award against plaintiff E.I. DuPont de Nemours and Company ("plaintiff"). This case requires us to discuss the proper standard of review of an arbitrator's decision and to apply that standard. For the reasons set forth below, we reverse the decision of the district court and order that the arbitration award be enforced.

## I

The controversy at issue involves the discharge of Willie McClendon by plaintiff on December 29, 1977. McClendon had been working the night shift (11:30 PM–7:30 AM) at plaintiff's plant for several days prior to the morning of December 26, 1977, and did not have any sleep before starting the late shift for December 25–26. At the end of that shift (*i.e.*, on the morning of December 26), McClendon had made arrangements with his supervisor Ralph Beiriger to meet him at the employee change house and to drive him to the front gate. However, when Beiriger came by to meet McClendon at 8:00 AM, McClendon was sitting naked in the change house and was not ready to leave. Beiriger stopped by at 8:30 AM and again at 9:00 AM, but McClendon was still naked and not ready to leave. Then, without any apparent provocation, McClendon flew into a rage. McClendon attacked Beiriger and damaged company property. McClendon, still naked, then ran into another building, where he struck an operator and attempted to create a chemical reaction that could have caused further damage. McClendon was finally subdued by police.

McClendon was admitted to the psychiatric ward of a hospital where he remained for more than thirty days. He took drug tests immediately after admission on December 26, and they were positive for both amphetamines and barbiturates. Three days later, the same tests were performed on McClendon and were negative. Physicians later testified that the initial tests could have been a false positive in view of the subsequent negative test and the fact that drugs remain in a person's system for three to four days. On December 29, McClendon was officially discharged for assaulting fellow employees and destroying company property. He was hospitalized for thirty days and has not been treated subsequently.

Pursuant to the collective bargaining agreement, defendant filed a grievance protesting McClendon's discharge. The grievance was denied by plaintiff, and the parties proceeded to submit the dispute to arbitration as required by the union contract. The critical issue at arbitration was whether McClendon was discharged for "just cause."

The arbitrator heard testimony that the incident could have been caused by drugs taken by McClendon or by his mental or nervous breakdown. The arbitrator weighed the evidence and concluded that McClendon suffered a mental breakdown, did not misuse drugs, and that the likelihood of McClendon's having a future breakdown was remote. The arbitrator reasoned that lack of fault must be considered in determining just cause for discharge, and that since McClendon's outburst was caused by a mental breakdown rather than drug use, he was not at fault for his outburst, and thus just cause was not established. The arbitrator considered the danger to other employees and company property posed by the continued employment of McClendon but concluded that these concerns were not significant because he found the likelihood of a future breakdown by McClendon to be remote. Additionally, the arbitrator noted that his conclusion of no just cause was buttressed by plaintiff's failure to follow its own procedural policy since it discharged McClendon without conducting a full investigation and giving him the opportunity to present his side of the story. Based on all of the above, the arbitrator reversed the discharge of McClendon and ordered him reinstated, though without compensation for lost wages for the twenty-one months between McClendon's discharge and his reinstatement.

The district court vacated the arbitrator's award. The district court stated that the arbitrator premised his decision on McClendon's lack of fault without equal consideration of safety in the workplace, and that this indicated that the arbitrator was enforcing his own notions of equity instead of the collective bargaining agreement. The court dismissed the procedural irregularities noted by the arbitrator as irrelevant to the determination of just cause. Finally,

the court noted that public policy concerns regarding the safety of the workplace supported its decision to vacate the arbitrator's award.

## II

At the outset, it should be stressed that judicial review of an arbitration award is extremely limited. *Camacho v. Ritz-Carlton Water Tower*, 786 F.2d 242, 244 (7th Cir.1986); *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Keystone Consolidated Industries, Inc.*, 782 F.2d 1400, 1402 (7th Cir. 1986); *Ethyl Corporation v. United Steelworkers of America*, 768 F.2d 180, 183 (7th Cir.1985), certiorari denied, — U.S. —, 106 S.Ct. 1184, 89 L.Ed.2d 300. With other deferential standards of review, we still review the merits of the question or issue decided below, but must be very certain that the decision below was erroneous before we reverse that decision. See, *e.g.*, Fed.R.Civ.P. 52(a) ("Findings of fact shall not be set aside unless clearly erroneous...."). When reviewing an arbitration award, however, the standard of review is even more deferential, since the judiciary has no power to reach and determine the merits of arbitration awards merely because of disagreement, even strong disagreement, with the arbitrator's interpretation of the contract. As here, so long as the arbitrator interpreted the contract in making his award, his award must be affirmed even if he clearly misinterpreted the contract. *Keystone Consolidated*, 782 F.2d at 1402; *Ethyl Corporation*, 768 F.2d at 184, 186. An award may be overturned only if the arbitrator must have based his award on his own personal notions of right and wrong, for only then does the award fail to "draw its essence from the collective bargaining agreement" as required by the Supreme Court in *United Steelworkers v. Enterprise Wheel*, 363 U.S. 593, 597, 80 S.Ct. 1353, 1361, 4 L.Ed.2d 1424, and by ourselves in *Ethyl Corporation*, 768 F.2d at 184–85; *Jones Dairy Farm v. Local No. P-1236, United Food and Commercial Workers International Union*, 760 F.2d 173, 176 (7th Cir.1985), certiorari denied, — U.S. —, 106 S.Ct. 136, 88 L.Ed.2d 112; *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 739 F.2d 1159, 1162 (7th Cir.1984), certiorari denied, — U.S. —, 105 S.Ct. 912, 83 L.Ed.2d 926. See generally R. Gorman, Labor Law—Unionization and Collective Bargaining 584–586 (1976); Note, *Judicial Review of Labor Arbitration Awards: Refining the Standard of Review*, 11 Wm. Mitchell L.Rev. 993, 995, 998 (1985).

This low standard of review is essential to prevent a "judicialization" of the arbitration process. *Ethyl Corporation*, 768 F.2d at 184. Arbitration is an alternative to the judicial resolution of disputes, and an extremely low standard of review is necessary to prevent arbitration from becoming merely an added preliminary step to judicial resolution rather than a true alternative. *Id.* The parties have bargained *ex ante* for arbitration as an alternative means of dispute resolution, and *ex post* they must abide by this bargain. *Camacho*, 786 F.2d at 244.

Given this standard of review, it cannot be said that this arbitrator based his award on his own personal notions of right and wrong rather than on an interpretation of the contractual phrase "just cause." The key to the arbitrator's award was his reasoning that the plaintiff lacked just cause to terminate McClendon because he was not at fault for his conduct. This notion of fault analysis as part of a just cause determination is not a novel concept based on the personal whims of a single arbitrator; the same concept has been applied by several other arbitrators. See, *e.g.*, *Johns-Manville Perlite Corp.*, 67 L.A. 1255, 1260 (1977); *Brown & Williamson Tobacco Corp.*, 60 L.A. 17, 22 (1972); *Silas Mason Co.*, 59 L.A. 197, 200 (1972); *Consolidated Foods Corp.*, 58 L.A. 1285, 1288 (1972). Similarly, the idea that the right to be discharged only if there is just cause contains certain procedural guarantees which were not met in the instant case is not so far-fetched that it could fairly be

said that the arbitrator was not interpreting "just cause" in the contract when he applied this concept. See, *e.g.*, *Whirlpool Corp.*, 58 L.A. 421, 427 (1972). In other words the arbitrator in the instant case did not apply "his own brand of industrial justice," *Steelworkers*, 363 U.S. at 597, 80 S.Ct. at 1361. While this Court does not necessarily agree with the arbitrator's conceptions of just cause, mere disagreement does not allow an overturning of the award.

■ Plaintiff contends that the arbitrator failed to give sufficient consideration to safety in the workplace. We disagree. First, he did not ignore workplace safety. Indeed he explicitly considered danger to company employees and property but concluded that these dangers were not significant since the likelihood of a future mental breakdown by McClendon is remote (Arbitrator's Award, pp. 25, 41). Second, and more significantly, since the arbitrator was interpreting "just cause" in the contract, we are not empowered to review either his factual finding that the likelihood of a future mental breakdown by McClendon is remote or his judgment that the remoteness of a future breakdown by McClendon renders any possible danger to workplace safety inconsequential.[1]

■ Plaintiff further contends that the enforcement of this arbitration award would violate public policy, specifically the public policy of providing a safe working environment as illustrated by various provisions of the Occupational Safety and Health Act. 29 U.S.C. §§ 651(b), 654. Of course we should overturn an arbitration award if it violates public policy. *W.R. Grace & Co. v. Rubber Workers Local 759*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298; *Keystone Consolidated*, 782 F.2d at 1403; *Local No. P–1236, Amalgamated Meat Cutters & Butcher Workmen of North America v. Jones Dairy Farm*, 680 F.2d 1142, 1144–45 (7th Cir.1982); *Wyman-Gordon Co. v. United Steelworkers of America*, 613 F.Supp. 626, 632 (N.D. Ill.1985). Unlike a review of the merits of the award itself, where, as illustrated above, there must be strong deference to the arbitrator, the question of whether the award violates public policy "is ultimately one for resolution by the courts." *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183; *Wyman-Gordon Co.*, 613 F.Supp. at 632. However, the public policy must be "well-defined and dominant" to justify a refusal to enforce the award on public policy grounds. *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183; *Keystone Consolidated*, 782 F.2d at 1403; *Wyman-Gordon Co.*, 613 F.Supp. at 632. Precisely because this doctrine allows courts to by-pass the normal heavy deference accorded to arbitration awards and potentially to "judicialize" the arbitration process, the judiciary must be cautious about overruling an arbitration award on the ground that it conflicts with public policy. *Waterside Ocean Navigation Co., Inc. v. International Navigation Ltd.*, 737 F.2d 150, 152 (2d Cir.1984); *Amalgamated Transit Union, AFL–CIO Local Division 1309 v. Aztec Bus Lines*, 654 F.2d 642, 644 (9th Cir.1981). See *Keystone Consolidated*, 782 F.2d at 1403; *Amalgamated Meat Cutters, Local 540 v. Great Western Food Co.*, 712 F.2d 122, 124 (5th Cir.1983); *Wyman-Gordon Co.*, 613 F.Supp. at 632.

Where an arbitration award has been overturned on public policy considerations, the court has not questioned the factual findings of the arbitrator. Rather, the court has found that, assuming all of the facts found below are true, the enforcement of the award will violate a public policy. See, *e.g.*, *Keystone Consolidated*, 782 F.2d at 1403–05 (refusal to apply waiver provision of ERISA in interpreting a pension agreement violated public policy behind enactment of ERISA); *Misco, Inc.*

---

1. Plaintiff essentially resurrects its challenges to both the arbitrator's factual finding that the likelihood of a future mental breakdown by McClendon is remote and the arbitrator's judgment that this remote chance of future harm to other employees and company property does not warrant the discharge of McClendon as a public policy argument. These two challenges are discussed further below.

v. *United Paperworkers International Union*, 768 F.2d 739, 742–43 (5th Cir.1985) (employee who clearly was smoking marijuana won arbitration award because of arbitrator's notion of industrial due process; such an award violated public policy against drugs); *United States Postal Service v. American Postal Workers Union*, 736 F.2d 822, 825–26 (1st Cir.1984) (employee who clearly embezzled money won arbitration award because of employee's intent to return money; such an award violated public policy against dishonest postal workers); *Great Western Food Co.*, 712 F.2d at 124–25 (truck driver who clearly was intoxicated on the job won arbitration award because of possible alternative cause of truck accident; such an award violated public policy against drunk driving); *Jones Dairy Farm*, 680 F.2d at 1144–45 (work rule which forbade employees from reporting unsanitary conditions directly to government officials violated public policy). While these courts correctly refused to defer to the arbitrator's conceptions of public policy, they continued to respect his findings of fact. It is in this context that plaintiff's contention must be examined.

The concurrence argues that an arbitration award cannot be overturned on public policy grounds unless the contract as construed by the arbitrator violates some rule of positive law. More precisely, in the context of the review of an arbitration award which orders the reinstatement of an employee because there was no just cause to terminate that employee, the concurrence argues that so long as the reinstatement of that employee does not violate any rule of positive law, the award cannot be overturned on the ground of public policy. However, the courts have never construed the public policy exception so narrowly. An employer who employs someone who has used drugs does not violate any rule of positive law, yet the Fifth Circuit overturned an award which ordered the reinstatement of an employee who was smoking marijuana on company premises, because the award violated public policy. *Misco*, 768 F.2d at 742–43. An employer

who employs a truck driver who admittedly drank while on duty does not violate any rule of positive law, yet the Fifth Circuit overturned an award which ordered the reinstatement of such an employee, because the award violated public policy. *Great Western Food Co.*, 712 F.2d at 124–25. If the Postal Service employs a convicted embezzler, this employment does not violate any rule of positive law, yet the First Circuit overturned an award which ordered the reinstatement of such an employee, because the award violated public policy. *American Postal Workers Union*, 736 F.2d at 825–26. In this last case, the union raised precisely the same argument that is proffered by the concurrence today: Even if there is a public policy against embezzling Postal Service funds, there is no public policy against the Postal Service employing convicted embezzlers, and to overturn an award on public policy grounds "[y]ou have to have something more—a direct legal prohibition." *Id.* at 824. Yet the First Circuit explicitly rejected such a requirement. *Id.* See generally Gorman at 597 ("when the award, although not requiring illegal conduct, is said to be inconsistent with some significant public policy," the award may be overturned).

The view of the public policy exception urged by the concurrence also conflicts with this Court's prior case law. In *Jones Dairy Farm*, we held that an arbitration award upholding a work rule which forbade employees from reporting unsanitary conditions directly to the government officials violated public policy, and we refused to enforce the award. *Jones Dairy Farm*, 680 F.2d at 1144–45. However, we never said that the work rule violated any rule of positive law, nor did the work rule violate any positive law. *Id. Jones Dairy Farm* is thus in complete harmony with the public policy exception as stated today.

 Nevertheless, given the above legal standard regarding the public policy exception to the review of arbitration awards, plaintiff's contention that the arbitrator's award violates public policy must be rejected. As already noted, there are

two components to the issue of workplace safety in this case. One component is the factual finding made by the arbitrator that the chance of recurrence of McClendon's violent acts is extremely remote. The second component is his judgment that this remote chance of harm to others does not mandate an award against McClendon. Assuming that workplace safety is a valid public policy, *cf. Super Tire Engineering Co. v. Teamsters Local Union No. 676,* 721 F.2d 121, 125 n. 6 (3d Cir.1983), certiorari denied, —— U.S. ——, 105 S.Ct. 83, 83 L.Ed.2d 31, the public policy doctrine allows this Court to decide *de novo* whether the judgment made by the arbitrator (*i.e.,* the second component identified above) violates public policy. Given the remoteness of a recurrence of McClendon's breakdown, we decide that the arbitrator's judgment was permissible. Plaintiff makes the additional argument that the factual finding that the chance of a recurrence is remote (*i.e.,* the first component identified above) is not supported by the record, and thus the policy of workplace safety is violated. This additional argument goes beyond the usual public policy argument, however, since it requires this Court to re-find facts found by the arbitrator, rather than accept the arbitrator's factual finding and decide whether the arbitrator's judgment based on that factual finding violated public policy. As already seen, courts applying the public policy doctrine have exercised only the latter function.

The appropriate standard of review for a factual finding such as this which pertains to a public policy exception has not yet been judicially established. On the one hand, plaintiff's attack on this factual finding can be viewed as an end-run around the normal extreme judicial deference to arbitral fact-finding. Under this view, a court would apply that same extremely deferential standard of review to this type of factual finding as with all arbitral factual findings. On the other hand, this kind of factual finding is different because it pertains to a public policy exception. An arbitral award is not to be enforced if it violates public policy, and this duty would be impaired if a court had to defer to clearly erroneous factual findings made by the arbitrator. Viewed in this light, a less deferential standard of review such as the "clearly erroneous" standard embodied in Fed.R.Civ.P. 52(a) might be more appropriate with respect to this type of factual finding.

We need not decide here the precise legal standard for reviewing a factual finding that pertains to a public policy exception since even under the less deferential clearly erroneous standard of review the arbitrator's factual finding that the likelihood of a future breakdown by McClendon is remote must be accepted.[2] This factual finding is supportable because although Dr. Polydefkis testified that a repeat occurrence of McClendon's breakdown is possible, Dr. Espindola testified that McClendon was not psychotic and was on the road to recovery (Tr. 151, 158). Additionally, McClendon had not experienced any incidents subsequent to the sole episode that led to his discharge.

For the above reasons, the judgment of the district court is reversed and the arbitration award will be enforced.

EASTERBROOK, Circuit Judge, concurring.

"Public policy" is an ambiguous term. A court that sets aside an arbitrator's award could mean: "Whether or not the award carries out the contract, there is a rule against this outcome." An arbitrator's reinstatement of white employees in preference to identically-situated black employees would violate public policy in this sense. If

**2.** In discussing the record in connection with this factual finding, both parties make numerous references to the arbitration hearing transcript. This transcript was never entered into the record in the district court and is not part of the record on appeal. We admonish litigants to include in the record all relevant material which they cite to in their briefs. Since both parties refer to this transcript, we will take judicial notice of it pursuant to Fed.R.Evid. 201. See generally 10 MOORE's FEDERAL PRACTICE § 201.- 60 (1976).

the contract does not authorize this differential treatment, the award fails because inconsistent with the contract; if the contract does authorize the difference, the award fails because several statutes prohibit racial discrimination in employment. DuPont does not argue, however, that its collective bargaining agreement with the union violates public policy in this way. If the agreement stated that "Employees who go berserk as a result of a psychiatric episode that is unlikely to recur may remain with the firm", this clause would not violate any rule of law.

Public policy is pertinent to an arbitrator's award in a second way. "When an arbitrator bases his award on public policy considerations, he has overstepped his authority and the court may review the substantive merits of the award." *Local No. P–1236, Amalgamated Meat Cutters v. Jones Dairy Farm*, 680 F.2d 1142, 1144 (7th Cir.1982). The arbitrator's job is to enforce the parties' bargain. An arbitrator is not authorized to substitute his own view of wise policy for that of the parties. *Ethyl Corp. v. United Steelworkers*, 768 F.2d 180, 183–85 (7th Cir.1985). So if the contract had contained the hypothetical clause giving an employee one free rampage, and the arbitrator had said "This violates public policy because it may reduce the level of safety in the plant", a court would set the award aside and instruct the arbitrator to carry out rather than frustrate the parties' lawful bargain.

Public policy is used in still a third way when a court claims the right to do what the arbitrator may not, to decide whether an award cuts at cross purposes with a policy the court thinks valuable. If an arbitrator reinstates an employee caught using drugs, the court may say that this undermines the public policy of deterring the use of drugs, so the award cannot stand. *Misco, Inc. v. United Paperworkers International Union*, 768 F.2d 739, 743 (5th Cir.1985). In this case, in which the arbitrator reinstated an employee whose behavior threatened the safety of other people, the district court concluded that the interest in the safe operation of the plant is more important that the employee's interest in working at DuPont, and it set aside the award.

The court today approves this inquiry in principle, although it disagrees with the district judge's implementation of the principle. I find the principle itself objectionable. A power to set aside awards on grounds of public policy, as distinct from rules of law, is too sweeping. A court lacks this power for the same reason the arbitrator does—the function of arbitrator and court is to carry out a contract, and contracts bind unless made unlawful by rules of positive law. There is a graver difficulty with the invocation of this loose use of "public policy" to set aside an award. It conflicts with a *real* public policy, one expressed in positive law. Section 9 of the Arbitration Act, 9 U.S.C. § 9, states that a beneficiary of an arbitration award may apply to a court "for an order confirming the award, and thereupon the court *must grant such an order* unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title" (emphasis added). This statute abrogates any equitable power courts formerly enjoyed to decide which awards to enforce. The only provision in § 10 or § 11 authorizing review of this award is § 10(d), which states that a court may vacate an award "[w]here the arbitrators exceeded their powers". This makes enforcement of the award turn on the meaning of the contract, not on equitable notions about public policy. If the contract violates a rule of law, then the contract itself may be set aside; this is the first use of public policy I discussed. But if the contract is lawful, and the arbitrator follows or interprets the contract within his authority, the court "must grant ... an order" enforcing the award.

Appellate courts, including this one, have not kept these meanings of public policy separate. But the distinction flows from the nature of the arbitrator's job and the command of the Arbitration Act. This may be clearer if we return to the case of the explicit contractual term. Suppose DuPont's contract expressly excused a single

psychotic tantrum, provided the problem was unlikely to recur, or suppose a contract excused a single episode of larceny from the employer. If the firm, honestly implementing its contract with the employees, reinstated the berserker or the thief (or never discharged him), no public policy would stand in the way. If the person's immediate supervisor fired him, and someone higher in the line of command reversed that decision as a result of a grievance, there would be no greater reason for review. A contract of arbitration transfers the power of this manager to the arbitrator. If the arbitrator carries out the contract, the decision should be treated the same as the management's own. Firms may place decisionmaking authority where they please, and the Arbitration Act restricts the court to ascertaining that the arbitrator was a faithful agent of the contracting parties. This does not mean that public policy is irrelevant. If the contract violates a rule of law, it must be set aside. That is what happened in *Local P–1236*, on which the majority relies. The firm forbade its employee to report violations of safety rules to federal safety inspectors, the arbitrator enforced the rule, and the court held that the rule violated public policy. *Local P–1236* does not support the majority's broader proposition that a court may set aside an award even when the arbitrator accurately construes the contract and the contract, so construed, is lawful.

Of course most collective bargaining agreements are not as detailed as the one I have been discussing. They provide, as this one did, that employees may be discharged for "just cause." The arbitrator must define just cause. He may infer that "fault" is a component of just cause, as the arbitrator in this case did, so that the contract then becomes just like my hypothetical—an employee who loses control of his actions without moral culpability (fault) may not be fired, unless recurrence is likely. The court must decide under § 10(d) of the Arbitration Act whether this is a permissible reading of the contract rather than a frolic of the arbitrator's. If the reading

is within permissible bounds—quite expansive, as *Ethyl* demonstrates—the case is identical to the one in which the clause is explicit. The public policy inquiry should be the same whether the arbitrator is applying an express clause of the contract or applying a general one (such as "just cause") that he has made concrete.

Whether the arbitrator deals with a general or a specific clause also makes no difference to the second stage of the judicial inquiry, whether the arbitrator has found facts that bring the employee within the clause. Here the arbitrator found that there is but a remote chance that the psychotic condition will recur. The majority hints that "public policy" might allow this finding of fact to be reviewed more liberally than other findings—such as, for example, a finding that the employee was not asleep on the job when the supervisor said he was. No other court has drawn this distinction, which would be both inconsistent with the Arbitration Act and also impossible to carry out when an arbitrator writes a brief opinion or none at all. *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). True, an arbitrator's decision may get little or no weight when the public policy is a law. For example, an arbitrator's decision that a person was not the victim of racial discrimination will get only the weight its persuasive force deserves. *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 n. 21, 94 S.Ct. 1011, 1025 n. 21, 39 L.Ed.2d 147 (1974). This limitation on review comes from the rule that an arbitrator's decision, like the contract on which it was based, must conform to law. If the decision, right or wrong, would be a lawful one—if, by hypothesis, the employer may retain thieves as well as sluggards on its payroll—there is no occasion for more searching review of a decision that the employee has learned his lesson and will not steal again than there is of a decision that he was not asleep on the job.

Considerations of public policy may have a different, less direct, influence on the decision to deny enforcement to an award when the terms of the contract are unclear. Suppose the contract says only that employees may be fired for "just cause," and the employer fires someone for theft. It is exceptionally unlikely that any (sane) employer would agree to keep thieves on the payroll. Theft is hard to detect. A thief caught in the act may have stolen before and might do so again. A stiff punishment for theft is in order. If no rational firm would enter into a contract expressly excusing theft, then a court should conclude that an arbitrator who does this is indulging a personal quirk, has succumbed to the desire to give someone a "second chance" and has abandoned his role as honest interpreter of the contract. Similarly, if because of potential liability to its workers for having an unsafe working environment no firm would adopt a clause giving a psychotic worker a second chance, an arbitrator who provides a second chance is expressing sympathy, administering home-brewed justice rather than the contract. Public policy may be a useful guide to the sorts of provisions that will not appear in contracts, and when no one will write the provisions expressly arbitrators may not infer them. If a court concludes, however, that the implication of a rule by the arbitrator is not a frolic, that a rational firm could have such a rule and apply it prospectively, then the only further role for public policy is to determine whether the rule violates positive law. A court may not engage in especially searching review of factual findings.

I therefore agree with Judge Stapleton "that the district court [is] bound to enforce the award unless it could be said that the *collective bargaining agreement*, as construed, [is] contrary to law or against public policy." *Local 863 International Brotherhood of Teamsters v. Jersey Coast Egg Producers, Inc.*, 773 F.2d 530, 536 (3d Cir.1985) (concurring opinion) (emphasis added). This is also, I think, the view of the Supreme Court. The Court has never held that an arbitration award that com-

plies with the contract and positive law may be set aside on the basis of vague beliefs about public policy. This is the Court's position:

> As with any contract, however, a court may not enforce a collective-bargaining agreement that is contrary to public policy. [The arbitrator's] view of his own jurisdiction [in this case] precluded his consideration of this question, and, in any event, the question of public policy is ultimately one for resolution by the courts. If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it. Such a public policy, however, must be well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests."

*W.R. Grace & Co. v. Local Union 759, International Union of Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983) (citations omitted). This passage makes all my points. The question is whether the contract, as construed, violates positive law; "general considerations of supposed public interests" do not justify setting aside an award. Public policy in this loose sense is off limits to courts and arbitrators alike.

Ours is therefore an easy case. The arbitrator was entitled to interpret the contract as establishing a "fault" standard. It is not irrational for an employer to excuse a single bizarre episode if signs point to recuperation. DuPont does not argue that employing a person with a history of psychotic behavior violates any rule of law, such as the Occupational Safety and Health Act; for all we know, DuPont can give McClendon a job far away from acids and other dangerous substances. The record discloses enough, given the exceptionally deferential standard of review, to permit the arbitrator to find that McClendon is unlikely to have a relapse. I therefore concur in the judgment, although not in any suggestion that courts may patrol arbitral decisions for compliance with "general

considerations of supposed public interests" as opposed to compliance with law.