**G.B. GOLDMAN PAPER COMPANY,**
Plaintiff,

v.

**UNITED PAPERWORKERS
INTERNATIONAL UNION,
LOCAL 286, Defendant.**

**Civil Action No. 95–7319.**

United States District Court,
E.D. Pennsylvania.

Feb. 3, 1997.

---

608

Richard E. Jaudes, St. Louis, MO, Jeffrey L. Braff, Philadelphia, PA, Timothy J. Sarsfield, St. Louis, MO, for Plaintiff.

Warren J. Borish, Philadelphia, PA, for Defendant.

### *MEMORANDUM*

ANITA B. BRODY, District Judge.

Plaintiff G.B. Goldman Paper Company ("the Company") brings this Motion for Summary Judgment requesting me to vacate an arbitration award which overturned the termination of Mr. Fred Golden ("Golden") and reinstated him with back pay and all benefits to which he is entitled under the collective bargaining agreement. Although the arbitrator found credible evidence that Golden harassed, intimidated, threatened, and assaulted his fellow employees, the arbitrator reinstated Golden because the Company did not consistently follow nor apply its own procedures for progressive discipline. The

Company asserts that the arbitrator erred by placing Golden back into the workplace because (1) the arbitrator improperly exceeded the scope of his authority by "dispens[ing] his own brand of industrial justice," and (2) placing a known dangerous individual such as Golden back into the workplace violates the public policy of workplace safety.

Defendant United Paperworkers International Union, Local 286 ("Union") cross-moves for summary judgment to enforce the arbitration award. The Union argues that the arbitrator did not exceed the scope of his authority and that the conduct Golden displayed did not rise to the level of violating public policy. For the reasons outlined below, I will grant the Union's Motion for Summary Judgment, thereby enforcing the arbitration award. I will deny the Company's Motion for Summary Judgment.

## I. Facts

■ I must take the facts as found by the arbitrator. *See United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 369, 98 L.Ed.2d 286 (1987).

The Company hired Golden in 1963, thirty-one (31) years before the incident giving rise to this action. Golden started as a utility person and later moved to the sheeting department. *Paperworkers Local 286 v. G.B. Goldman Paper Co.,* No. 14–300–1538–94A, 14 (1995) (Symonette, Arb.) (hereinafter "Arbitration Award"). In 1980, Golden transferred to the maintenance department because he claims he was being harassed by his fellow employees in the sheeting department. In 1983, Golden rotated onto the third shift, the late-night shift, and remained in the maintenance department until 1989.[1]

In 1992, Golden was assigned to a clamp truck. He worked in the receiving department and did not encounter other employees on that shift. Although he was eventually given a permanent assignment in the receiving department, on September 19, 1994—the date of the incident giving rise to Golden's termination—he was temporarily assigned to work on the roll line because of a driver's absence. *Id.* at 14. Golden had been working at the Company for thirty-one (31) years when he was discharged.

Golden was assigned to drive the clamp truck on the roll line during the third shift on the day in which the incident giving rise to his discharge occurred. The clamp truck is a fork-lift with a claw-like clamp instead of a fork. The clamp truck is used to remove wrapped rolls of paper from a line. The clamp truck clamps around the roll of paper and rotates it from a horizontal to vertical position. The driver then transports and stacks the roll in the warehouse area of the plant. Golden had removed a roll of paper from the line when the incident-in-question occurred. Emanuel Ofori, an employee working as a sheeter (a production position) had returned from the receiving dock after emptying a box truck of refuse. A box truck is a large rectangular container that is moved with the assistance of a hand propelled jack. In order to return to his area of production, Ofori was using the hand propelled jack to guide the box truck through an aisle between stacks of rolls and across an aisle in the area where Golden was removing and transporting rolls of paper. The area was just wide enough for the box truck to slip through. *Id.* at 3.

In order to stack a roll he had just removed, Golden had to drive his truck past Ofori and the box truck. Ofori, however, had stopped before reaching the aisle to permit Golden to drive the clamp truck past him. *Id.* at 10. At this time, Golden drove the clamp truck into the box truck, pushed it off its jack, and continued transporting the roll to the warehouse area. Charles McKinstry, another employee who was eight (8) feet away at a nearby water-fountain, saw the incident. *Id.* at 3.

Ofori reported this incident to the third shift supervisor, Donald Harmer, claiming that Golden deliberately attempted to hit him. Harmer then spoke to McKinstry who also said that Golden's actions were inten-

---

1. In 1984, Golden was fired for six days by Harry Hoopes, the vice-president and plant manager, but the arbitrator's decision does not state the reason for his termination. In 1989, Golden decided to transfer back to the sheeting department because he claims he was the victim of sexual harassment by his co-workers.

tional. Upon returning to his work station, McKinstry saw Golden talking to another employee while at the same time pointing his finger at him. McKinstry approached Golden and another altercation followed. McKinstry warned Golden that if he had anything to say to him he should say it to him personally. Golden then called McKinstry a liar and a coward and proposed that they settle their differences at the end of the shift. McKinstry responded that they could settle their differences at that moment. Golden walked away. Arbitration Award at 11–12.

Thereafter, Harmer confronted Golden about the incident. Hearing Harmer's accusations, Golden became belligerent and loud. Golden denied trying to hit Ofori and insisted that Ofori had no business being in the area he was at the time of the incident. Golden also called Harmer a "racist" and asserted that when Harmer whistled in Golden's direction that Harmer intended to sexually harass him.

At the end of the shift, Harmer reported this incident to the plant manager, Chuck Doman, recounting his conversations with Ofori, McKinstry, and Golden. Doman asked Harmer's advice on what action should be taken as a result of the incident. Harmer recommended that Golden be terminated. Doman drafted and signed a letter dated September 19, 1994 which stated:

> This is to inform you that you are suspended for 3 day [sic] with the intent to discharge for harassing, intimidating and threatening bodily harm to your fellow employees. Do not report to work or attempt to gain access to G.B. Goldman Paper Co. The union was informed of our intentions.

*Id.* at 4. Doman sent the letter to an address where Golden had lived several years before, and as a result, Golden did not receive the letter until one full year later. All

this time after the incident, although not mentioned by the arbitrator, presumably Golden was still working or he would have had notice of the grievance. On September 20, 1995, when he finally received the letter from Doman, Golden filed his grievance.[2]

At the arbitration hearing on May 12 and June 22, 1995, the Company called upon several of its employees to describe the September 19, 1994, incident, and further to testify about what management contended was a continuing pattern of threats and intimidation by Golden towards his fellow employees. The background evidence that the Company presented at the arbitration hearing included testimony by Ofori that Golden had accused him of intentionally scratching Golden's car quite some time before, and that since that encounter, Golden had threatened to kill Ofori and had constantly referred to him as a "sick dog." This had been reported to management on several occasions. *Id.* at 10.

The Company also offered testimony from two other of their employees, Myron Iwanycky and Al Szymanski, maintenance men also assigned to the third shift. Both men testified that in August 1994, they were driving a golf cart down the main aisle when Golden came out of one of the side aisles barely missing them and forcing them to swerve. The arbitrator made no finding that Golden was driving a clamp truck during this incident. They testified that they felt Golden intentionally tried to injure them. Iwanycky claimed that Golden regularly called him a "sick dog" and a "pervert." Szymanski asserted that "on numerous occasions" Golden would drive the clamp truck at him and/or drop paper rolls in his path. Szymanski also claimed that Golden had threatened to kill him and referred to him as a perverted homosexual.

---

**2.** Golden's grievance stated:

> Unfairly suspended with intent to discharge. I have been charge [sic] with harassing and threatening fellow employees when I was the one harassed and threatened. This month I left the roll to get away from harassment. Monday third shift, I was reassigned to the roll line. In carrying out my duties as have done there for I don't how along I attempted to pass employees in a congested area and nudged a

> box truck. These employees informed the supervisor and for some reason lied saying I tried to hit one of them. I have worked the roll line a long time and have never hit to tried to hit anyone. This can be confirmed by my fellow workers that I work with on the line. This is further harassment from management which included over 5 years sexual harassment and attempted [sic] on my life by Don English.

Arbitration Award at 4.

Mario Tatum, a maintenance man and member of the Executive Board of the Union, testified that he and Golden were friends for most of his twenty-two (22) years with the Company. He testified, however, that their relationship changed after Golden once told him that Golden believed that other members of the maintenance department were sexually harassing him by grabbing their genitals in his presence. *Id.* at 13. Tatum expressed his disbelief and suggested that Golden must be joking. After that time, Golden asserted Tatum also sexually harassed him. Golden would confront Tatum, an African–American, and call him a "white man's nigger" and an "ass-kisser." On one occasion, Golden and Tatum yelled back and forth until the plant manager broke up the confrontation. Tatum testified that Golden's harassment had reached a point such that it would be in everyone's best interests if Golden were terminated.

Don English, a supervisor for the Company and former co-worker of Golden's, testified about a claim Golden made asserting that English had made an attempt on Golden's life. One morning thirteen years earlier, while English was driving toward the plant with his wife and children in his car, he moved into the left lane to pass a refuse truck. As he was passing, Golden drove by in the opposite direction. English waived at Golden. When he got to work, another employee informed English that Golden claimed that English had tried to kill Golden in his car on the way to work. When English subsequently confronted Golden about this, Golden replied that English had attempted to run him off the road and that the vice-president and plant manager, Harry Hoopes, had orchestrated this scheme. Furthermore, Golden asserted that as a reward for those efforts, Hoopes had made English a supervisor. English also testified that since that time Golden constantly harassed and threatened him and that Golden often refers to him, an African–American, as a "white man's nigger" and "Harry's puppet." In addition,

English claimed that in 1987 Golden pushed him in the presence of a salesman and threatened to "kick his ass." English claims to have reported this incident to management. *Id.* at 13–14.[3]

Golden also testified at the arbitration hearing. He denied trying to hit Ofori. Instead, he explained that in the congested area in which he was working he had to drive around people throughout the shift. *Id.* at 14. Golden testified about how his co-workers sexually harassed him in the sheeting and maintenance departments. He explained that since 1980 Hoopes had conspired against him and harassed him. He claimed that in 1984 when Hoopes attempted to fire him, Hoopes slapped Golden in a meeting with both union representatives and management present. Consistent with the testimony of Don English, Golden also contended that Hoopes bribed English to attempt to kill him. Golden also testified that Hoopes co-opted Union officers in an attempt to force him from the plant. Golden claimed that the father of Union Business Agent Carlos Simone, Jr., had worked with Hoopes against him. Golden maintained throughout, however, that he never threatened or intimidated anyone with the clamp truck. *Id.* at 15.

Based upon the testimony presented at the arbitration hearing, the arbitrator concluded that "[Golden] did harass, threat [sic], and intimidate employees in violation of company rules." *Id.* In addition, the arbitrator found Golden

> to have open contempt for all of the employees involved and in essence substantiated the accusations leveled against him by the other employees. Despite his lengthy and often rambling testimony, the grievant appeared to disregard the charges asserted against him and defiantly asserted that management conspired against him and that certain employees harassed him. None of these accusations were substantiated by the grievant.

---

**3.** Goldman also presented testimony from Mr. Potts who claimed that in 1984 Golden attempted to hit him with a clamp truck but instead missed him and hit a wall. Arbitration Award at 12. Potts claimed that such incidents occurred frequently. Potts, however, is the only witness who the arbitrator did not find to be credible. As a result, I accept the arbitrator's findings and not consider Potts' testimony as relevant to my review.

*Id.* The arbitrator concluded that Golden did not attempt to kill Ofori or any of the other employees but did not find credible Golden's explanation that he drove close to other employees or hit Ofori's box truck because of congestion in the work area. The arbitrator found Golden to be a "trained and experienced driver" who was capable of maneuvering his truck with "due caution" on the plant floor. *Id.* at 15–16. As a result, the arbitrator concluded that

> because of the animosity between [Golden] and the other employees on the shift[, Golden] drove his vehicle recklessly in order to intimidate those employees in the area ... Given the grievant's attitude as demonstrated by his testimony, it is reasonable to believe that his action was intentional.

*Id.* at 16.

While the arbitrator determined that discipline was warranted under the circumstances of this case, he found that the Company had not properly followed its own internal progressive disciplinary procedures. Under the Shop Rules, the Company has one set of rules for Group "A" offenses and another set of rules for Group "B" offenses. Group "A" offenses are subject to immediate discharge for the first violation while Group "B" offenses are subject to progressive discipline such that the employee is first entitled to a written warning and then a five (5) day suspension before ultimately being discharged.

The Shop Rules state:

1. *General Rules*

 \* \* \* \* \* \*

 B. If an employee violates these rules in such a way as to indicate a pattern of flagrant or continuing infractions, disciplinary action of greater severity than that shown below will be taken.

2. *Company Rules and Regulations*

The contract provides for discharge for refusal to comply with the company rules. The following rules are established by the company, and violation thereof will result in the disciplinary action as indicated below:

A. *Group "A" Rules*

These are rules of such basic importance that any violation cannot be permitted—such violation will result in immediate dismissal.

\* \* \* \* \* \*

B. *Group "B" Rules*

These are important rules, and violations are considered major infractions. They do not necessarily require immediate discharge, however, the penalty for violation of these rules are:

1st offense ............... Written warning

2nd offense ........... Final written warning & (same rule within 2 years) suspension for 5 work days

3rd offense ................... Discharge (same rule within 3 years)

1. Engaging in fighting on plant premises at any time.

\* \* \* \* \* \*

4. Coercing, intimidating, or threatening fellow employees. G.B. Goldman Paper Co. Shop Rules and General Information for Employees at 7, 9 (hereinafter "Shop Rules"). Because Doman's letter to Golden stated that Golden was being "suspended for 3 day [sic] with the intent to discharge for harassing, intimidating, and threatening bodily harm to your fellow employees," the arbitrator found that the Company cited Golden for a Group "B" violation, thereby subjecting Golden to the progressive discipline outlined in the Shop Rules. Arbitration Award at 4.

According to Golden's personnel file, the most recently documented discipline before the incident on September 19, 1994, was dated November 1, 1993. On that date, Golden received two warning letters from Harmer concerning separate incidents with Szymanski and Ofori. In the letter referencing the incident with Szymanski, Harmer wrote, "if anything happens like this in the future, I will have no alternative but to enforce disciplinary action as outlined in the shop rules." *Id.* at 18. In the letter concerning Golden's confrontations with Ofori, Harmer wrote, "if [Golden] continues to threaten [Ofori] or anyone else on this shift, I will have [no] alternative but to follow the guidelines of the shop rules, group B rules and I will suspend

[Golden] for five working days." Despite the testimony of Ofori, Szymanski, Iwanycky, Tatum, and English indicating that Golden had a pattern of harassing and intimidating fellow employees, no other incidents concerning Golden were documented in Golden's file until the date of his discharge. Thus, although Golden was still acting inappropriately, he was never given a five (5) day suspension and a final written warning that his behavior was unacceptable. Therefore, because Golden previously had only been given an initial warning, the Union claimed that Golden should have received no more than a five (5) day suspension for his behavior on September 19, 1994, involving the clamp truck, the box truck, and Ofori.[4] The arbitrator agreed. He held:

> A basic element of just cause provides that once an employee is advised of a company's rules he or she should have the reasonable expectation that the company will consistently enforce those rules and the penalties assigned therein.

*Id.* at 17. Because the Company had not consistently applied its own rules despite its threat to do so, the arbitrator found that Golden was not terminated for just cause. As a result, he converted Golden's termination into the five day suspension (with back pay, interim earnings, and full benefits) required had the Company followed the Shop Rules. In addition, the arbitrator determined that the arbitration award would serve as Golden's final warning.

## II. Discussion

The Company requests summary judgment to vacate the labor arbitration award reinstating Golden. First, I will deal with the Company's claim that the arbitrator exceeded the scope of his authority by impermissibly dispensing his own brand of industrial justice when he reinstated Golden. Then, I will discuss the Company's claim that reinstating Golden violates the public policy of workplace safety.

**Did the arbitrator exceed the scope of his authority?**

The Company claims that the arbitrator exceeded the scope of his authority by reinstating Golden with back pay and benefits. The Company maintains that it has exclusive discretion over the disciplinary measures it metes out. Hence, once the Company found company violations to have occurred, the arbitrator improperly dispensed his "own brand of industrial justice," *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), by reviewing and reversing the discipline the Company implemented. In doing so, the Company argues that the arbitrator's decision explicitly conflicts with the express terms of the collective bargaining agreement and the Shop Rules. Specifically, the Company points to the management rights clause in the collective bargaining agreement which confers in the Company the exclusive right to terminate employees which states:

> It is understood and agreed that the Management of the Plant and the supervision of the working forces, including ... discharge for proper cause ... is vested exclusively in the company.

Labor Agreement, art XVI. In addition, the Company proffers the Shop Rules which the Company claims grants it exclusive rights concerning the termination of employees. The Shop Rules provide that assault and insubordination—both Group "A" offenses—can be punishable by immediate discharge.[5] In light of these negotiated provisions, the Company claims that the arbitrator violated the express terms of the labor contract by reinstating Golden after the Company properly terminated him for his past behavior and the incident between Golden and Ofori on September 19, 1994.

In contrast, the Union contends that the arbitrator's decision was clearly within the arbitrator's power and that this court cannot

---

**4.** Iwanycky, Szymanski, Tatum, and English submitted statements to management concerning the inappropriate behavior of Golden after the September 19, 1994, incident with Ofori occurred. Arbitration Award at 19.

**5.** Group "A" Violation, Rule 2 provides that an employee will be subjected to immediate dismissal for an "[u]nprovoked assault on another employee or member of management."

properly reverse the arbitrator's decision on the grounds stated by the Company. The issue of whether Golden was terminated for "just cause" was before the arbitrator. As "just cause" is not defined by the collective bargaining agreement, the Union asserts that it was within the arbitrator's authority to construe its meaning. In addition, the Union claims that precedent in the Third Circuit establishes that an arbitrator's construction of a "just cause" provision will be upheld notwithstanding language in the agreement reserving in management the exclusive right to terminate its employees. Furthermore, despite the representations of the Company, the Union maintains that Golden, in fact, was disciplined under a Group "B" violation, not a Group "A" violation. Specifically, Golden was discharged for "harassing, intimidating, and threatening bodily harm" to fellow employees—actions which the arbitrator found to be Group "B" violations.[6] Hence, the Union argues that Golden should not have been subjected to the immediate discharge penalties of Group "A" violations. Therefore, when the arbitrator crafted the arbitration award, *inter alia*, he sanctioned Golden to a five-day suspension as provided under the progressive discipline outlines under Group "B".

■ A district court has a very limited scope of review of an arbitration award. *Arco–Polymers, Inc. v. Local 8–74,* 671 F.2d 752, 754 (3d Cir.1982). District courts must enforce an arbitration award as long as the award "draws its essence from the collective bargaining agreement." *Super Tire Eng'g Co. v. Teamsters Local Union No. 676,* 721 F.2d 121 (3d Cir.1983) (quoting *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983)). An arbitration award "draws its essence from the collective bargaining agreement" if:

> the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention; only where there is manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of

the shop, may a reviewing court disturb the award.

*Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128 (3d Cir.1969). Federal courts should not substitute their judgment for that of the arbitrator's because it is the arbitrator's construction of the collective bargaining agreement that was bargained-for. *Enterprise Wheel,* 363 U.S. at 599, 80 S.Ct. at 1362. Similarly, a federal court may not overrule an arbitrator's decision simply because it believes its interpretation of the collective bargaining agreement is better than the arbitrator's. *W.R. Grace & Co.,* 461 U.S. at 764, 103 S.Ct. at 2182. " '[T]he interpretation of labor arbitrators must not be disturbed so long as they are not in 'manifest disregard' of the law, and that 'whether the arbitrators misconstrued a contract' does not open the award to judicial review.' " *Arco–Polymers,* 671 F.2d at 755 (quoting *Ludwig,* 405 F.2d at 1128).

■ In the present case, the arbitrator did not exceed the scope of his authority. The arbitrator found that the Company discharged Golden for "harassing, intimidating and threatening bodily harm to fellow employees." Arbitration Award at 16. The arbitrator concluded that such was a Group "B" violation that should have been subjected to the progressive disciplinary procedures as outlined in the Company's Shop Rules, a conclusion I must accept. "The courts ... have no business weighing the merits of the grievance, considering whether there is equity in a particular claim or determining whether there is particular language in the written instrument which will support the claim...." *United Steelworkers of Am. v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). "The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Enterprise Wheel,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). "[P]lenary review by a court of the merits would make meaningless the provision that the arbitrator's decision is final, for in reality it would almost never be final." *Id.* at

---

6. As a Group "B" violation, the Shop Rules precisely provide:

4. Coercing, intimidating, or threatening fellow employees. Shop Rules at 9.

599, 80 S.Ct. at 1362. Indeed, "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.*

 The arbitrator also did not exceed the scope of his authority by interpreting "just cause" to require the Company to consistently apply and enforce its own disciplinary rules and procedures. Because the term "just cause" or "proper cause" was not explicitly defined in the collective bargaining agreement, it was within the arbitrator's authority to construe the term in a manner he thought proper. *See United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 380 (3d Cir.1995). The arbitrator concluded that

> [a] basic element of just cause provides that once an employee is advised of a company's rules he or she should have the reasonable expectation that the company will consistently enforce those rules and the penalties assigned therein.

Arbitration Award at 17. While the arbitrator found Golden's behavior "inappropriate for the workplace," *id.* at 20, he emphasized that the Company did not enforce its progressive disciplinary procedures. Despite the fact that after Golden's incidents with Szymanski and Ofori in November 1993, when management indicated in Golden's file that another incident instigated by Golden would result in a five (5) day suspension, the Company did not impose that penalty when several other infractions of company rules occurred. Instead, after the September 19, 1994, incident with Ofori, the Company simply decided to discharge Golden notwithstanding the fact that Golden had not been given a five (5) day suspension or proper warning as indicated by management in file and in the Shop Rules. As a result, the arbitrator converted Golden's termination into a five (5) day suspension as should have been done as the published and negotiated Shop Rules indicate. Given the severity of Golden's behavior, the arbitration award also served as Golden's final warning.

 While the Company claims that the arbitrator disregarded the collective bargaining agreement and instead "dispens[ed] his own brand of industrial justice" by reinstating Golden, Pl.'s Mem.Supp.Am.Mot. Summ.J. at 11, absent specific language to the contrary, Third Circuit precedent clearly permits an arbitrator to interpret causes for discharge—including immediate dismissals—as being subject to a "just cause" provision in the agreement. *See Super Tire*, 721 F.2d 121 (3d Cir.1983) (immediate dismissal provision for drinking during working hours interpreted in light of "just cause"); *Arco–Polymers*, 671 F.2d at 756 (legitimate for arbitrator to subject all discharges to "just cause" provision in agreement). Because "just cause" is not expressly defined in the collective bargaining agreement between the Company and the Union, it is within the arbitrator's capacity to determine its meaning. In this case, it appears that

> the parties bargained for contractual ambiguity instead of defining "proper cause" in the [collective bargaining agreement]. Having decided not to define the phrase, [the Company] cannot escape the results of that bargain simply because the arbitrator has chosen to interpret that phrase differently than [the Company] may have wanted—even if [the Company's] interpretation of the [collective bargaining agreement] is more reasonable than the result announced by the arbitrator.

*United Transp.*, 51 F.3d at 380. Furthermore, as in the case at hand, the Third Circuit has recognized that

> '[i]n a proper case an arbitrator ... may construe a "just cause" provision of a labor contract to include a progressive discipline requirement and may determine that certain conduct is "just cause" for discipline but not for discharge.'

*Id.* (quoting *Mistletoe Express Serv. v. Motor Expressmen's Union*, 566 F.2d 692, 695 (10th Cir.1977)). Therefore, contrary to the Company's assertions, the arbitrator acted within the scope of his authority when he interpreted "just cause" to require the progressive disciplinary protocol as outlined in the Shop Rules.

Furthermore, the Company has no basis upon which to contest the arbitrator's fashioned penalty. After considering all the evidence, the arbitrator concluded that discipline was warranted but the penalty of discharge was inappropriate under the circumstances. The Third Circuit has consistently enforced arbitration awards that formulate an appropriate penalty after the arbitrator has concluded that the penalty of discharge was too extreme. In *United Transp. Union Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376 (3d Cir.1995), the Third Circuit reversed the district court's vacation of a labor arbitration award which reinstated a bus driver after he rear-ended a tractor-trailer. In the twelve (12) years which the grievant had been employed, he had been involved in twenty-four (24) accidents, nine (9) which were deemed preventable. The incident giving rise to the grievant's termination was his third preventable rear-end collision. The arbitrator concluded that termination was too extreme a penalty for a "veteran employee" who had never been given the opportunity to improve his driving skills through a retraining program. The arbitrator determined that the Company had proper cause to punish the grievant, but not proper cause to discharge him. Instead, the arbitrator ruled that a suspension and a retraining program were appropriate penalties. Similarly, in *Super Tire Eng'g Co. v. Teamsters Local Union No. 676,* 721 F.2d 121 (3d Cir.1983), an arbitrator reinstated an employee who was fired for drinking during working hours. Although the arbitrator found the employee was guilty as charged, he decided that the penalty of discharge was too severe because the grievant had never been given a warning. While the employee had been previously suspended for one day after he was accused of drinking during working hours, the Company never warned him of the automatic sanction of discharge for such a violation. The arbitrator concluded that "there must ... be a clearly understood and uniform application of the rule against drinking prior to its strict application." *Id.* at 123. In reversing the district court's vacation of the arbitration award, the Third Circuit stated that " '[w]e cannot say that the arbitrator's award does not draw its essence from

the contract.' " *Id.* at 125 (quoting *Arco-Polymers,* 671 F.2d at 756–57). Likewise, in the case at hand, I cannot say that the arbitrator's award does not draw its essence from the collective bargaining agreement. In fact, he simply imposed the penalty that should have been assessed upon Golden given Golden's offense had the Company followed its negotiated disciplinary procedures as outlined in the Shop Rules. As a result, I conclude that the arbitrator did not exceed the scope of his authority by reinstating Golden with back pay and benefits.

## III. Would enforcing the arbitration award by reinstating Golden violate the public policy of workplace safety?

The Company contends that I should vacate the arbitration award because reinstating Golden violates the public policy of workplace safety by returning a known dangerous and violent person to the workplace. Thus, I must first determine if such a public policy exists, and, if it does, whether the Company has met its burden of proof that the public policy has been violated in this case.

### A. Is there a public policy of workplace safety?

Questions of public policy must ultimately be resolved by the courts, not the arbitrators. *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers,* 834 F.2d 1424, 1427 (8th Cir.1987) (quoting *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. at 2183.) When an arbitration award violates public policy, a district court can properly vacate that award. *United Transp.,* 51 F.3d at 381. Nevertheless, the public policy exception permitting a district court to vacate a labor arbitration award is extremely narrow. *Service Employees Int'l Union Local 36 v. City Cleaning Co., Inc.,* 982 F.2d 89, 92 (3d Cir.1992). The award must violate a "well defined and dominant" public policy, derived " 'by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Exxon Shipping Co. v. Exxon Seamen's Union,* 73 F.3d 1287, 1291 (3d Cir. 1996) (*"Exxon III"*) (quoting *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. at 2183).

Therefore, to determine whether the public policy exception applies to vacate an arbitration award, a court must consider two factors: (1) can a well defined and dominant public policy be identified? And, if so, (2) does the arbitration award violate that public policy? *Id.* In reviewing arbitration awards on public policy grounds, a court must taking the facts as found by the arbitrator but review his or her conclusions *de novo. Iowa Elec.,* 834 F.2d at 1427; *E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n,* 790 F.2d 611, 617 (7th Cir.1986).

█ To violate public policy, the enforcement of an arbitration award does not necessarily have to violate a positive law. Rather, the Third Circuit has adopted a broader approach holding that "arbitration awards reinstating employees may be vacated if the awards are 'inconsistent with some significant public policy.'" *Exxon Shipping Co. v. Exxon Seamen's Union,* 11 F.3d 1189, 1192 (3d Cir.1993) (*"Exxon II "*) (quoting *Exxon Shipping Co. v. Exxon Seamen's Union,* 993 F.2d 357, 363) (3d Cir.1993) (*"Exxon I "*).

In the present case, the Company asserts that reinstating Golden to the workplace would violate the "well defined and dominant" public policy of workplace safety by reinstating a known violent and dangerous person to the paper plant. The Company argues that Pennsylvania case law subjecting an employer to tort liability for knowingly employing a dangerous person, *see Dempsey v. Walso Bureau, Inc.,* 431 Pa. 562, 246 A.2d 418, 421 ("[T]he knowing employment of a dangerous employee who inflicts bodily injury upon a fellow employee constitutes a common law tort on the part of the employer.") (citation omitted), and Section 5(a), the "General Duty" clause, of the federal Occupational Safety and Health Act ("OSHA")[7] "unquestionably satisfy the legal precedent requirement" to recognize a public policy of workplace safety. Pl.'s Mem. in Supp.Am.Mot. Summ.J. at 4. In addition, the Company

asks me to infer from the facts found by the arbitrator that Golden is a threat to the safety of his fellow employees.

Workplace violence has become an increasingly more prominent concern to employers around the country in recent years. *See* Robin Benedick, "Officials Address Worker Violence: Las Olas Killings Spur New Policies," *Sun–Sentinel,* May 3, 1996, at 3B (1996 WL 2501910); John P. Furfaro and Maury B. Josephson, "Workplace Violence—Part I," N.Y.L.J., May 5, 1995, at 3. In 1994, there were 1071 workplace homicides, totalling sixteen (16) percent of the 6588 fatal work injuries. Mike Maharry, "Workplace Safety Guidelines Issued," *The News Tribune,* Mar. 15, 1996, at B9 (1996 WL 2982057). Concern about violence in the workplace prompted the Labor Department in March 1996 under OSHA to issue guidelines to prevent and reduce workplace violence in health care and social service industries—where almost two-thirds of all nonfatal workplace violence occurs. Guidelines for Preventing Workplace Violence for Health Care and Social Service Workers—OSHA 3148–1996 at 2 (Mar. 14, 1996) <http://www.osha.gov/oshpubs/workplace>. The agency also intends to issue guidelines for retail workers, where the assault rate is lower than in health care and social service industries but the homicide rate is higher. Leigh Page, "First Federal Guidelines Issued on Workplace Violence," *American Medical News,* Apr. 8, 1996 at 8 (1996 WL 7990236). Furthermore, local governments have begun to implement programs to reduce and prevent violence in the work environment. *See* Robin Benedick, "Officials Address Worker Violence: Las Olas Killings Spur New Policies," *Sun–Sentinel,* May 3, 1996 at 3B (1996 WL 2501910). That the matter of workplace safety has prominently manifested itself on federal and local agendas indicates that safety in the work environment has become a well-defined and dominant public policy that this court should recognize.

---

7. Section 5 of OSHA states:
 (a) Each employer—
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

 (2) shall comply with occupational safety and health standards promulgated under this chapter.
29 U.S.C.A. § 654(a) (West 1985).

Legal precedent has also described the public policy concerning workplace safety. In *United States Postal Serv. v. National Ass'n of Letter Carriers*, 839 F.2d 146 (3d Cir.1988) ("*USPS*"), the Postal Service suspended and discharged an off-duty postal employee, Edward Jackson, who had fired gun shots at his Postmaster's empty parked car, damaging the windshield, dashboard, and front seat. At the arbitration hearing, several mitigating factors lead the arbitrator to conclude that discharge was an inappropriate form of disciplinary action. Among other things, the arbitrator found that Jackson had been a peaceful, non-violent person during his thirteen (13) year tenure and that Jackson was concerned that he was a victim of racial discrimination because he had not been promoted despite his excellent qualifications. The arbitrator also concluded that suspension without pay in this case was improper. While the collective bargaining agreement provided that one could be suspended only if employment could result in damage or injury, Jackson had been suspended eleven (11) days after the incident occurred during which time Jackson had exhibited no propensities towards violence. *Id.* at 147.

The Postal Service brought an action in district court to vacate the arbitration award claiming that reinstating Jackson would violate the public policy of workplace safety. In vacating the award, the district court stated:

there is an indisputable public policy against permitting an employee to direct physical violence at a superior, and an equally compelling policy against forcing that superior to again employ the man.

*Id.* at 148 (quoting *United States Postal Serv. v. National Ass'n of Letter Carriers*, 663 F.Supp. 118, 119–20 (W.D.Pa.1987)). On appeal, the Third Circuit reversed. Assuming that a public policy of workplace safety existed, the Third Circuit concluded that reinstating Jackson would not violate that public policy because Jackson did not manifest any violent tendencies at the time of his reinstatement. It stated:

A judgment about the offending employee's "amenability to discipline" comes under the scope of the arbitrator's factfinding authority, and in this case, arbitrator LeW-

inter determined in the scope of his authority that the facts indicated that upon return to work Mr. Jackson showed no proclivity to further aggression.

*USPS*, 839 F.2d at 149. Therefore, in formulating its assumed public policy of workplace safety, the court suggested that the manifestation of violent or aggressive tendencies should be present before a court would vacate an arbitration award on this public policy ground. On the facts of Jackson's case, because he displayed no such tendencies his discharge would not have to be affirmed for the vindication of this policy.

In *Super Tire Eng'g Co. v. Teamsters Local Union No. 676*, 721 F.2d 121 (3d Cir. 1983), Super Tire fired an employee, Mitchell Gray, for drinking alcoholic beverages during working hours. After the arbitration hearing, the arbitrator reinstated Gray because he had not been given an adequate warning about the penalty of immediate dismissal for drinking during working hours. In a footnote, the Third Circuit commented that reinstating Gray would not violate public policy, in part, because "[t]here was no evidence that Gray poses a threat to fellow workers or society." *Id.* at 125 n. 6. Thus, the Third Circuit suggested that had Gray posed a threat to fellow workers or society that the public policy of workplace safety would have been violated by his reinstatement.

In *E.I. DuPont de Nemours and Co. v. Grasselli Employees Indep. Ass'n*, 790 F.2d 611 (7th Cir.1986), a late-night shift employee, Willie McClendon, was fired for assaulting fellow employees and destroying company property. At the time of the incident, McClendon's supervisor, Ralph Beiriger, had come by the change house at the Company plant at 8:00 a.m. to drive McClendon to the front gate. Beiriger found McClendon sitting naked and not ready to leave. Beiriger returned at 8:30 and again at 9:00, but McClendon was still naked and not prepared to go. Then, without provocation, McClendon attacked Beiriger and damaged company property. Afterwards, McClendon ran naked into another building, struck an operator, and attempted to create a chemical reaction that could have caused more damage to company property. McClendon was ulti-

mately taken into custody by the police. *Id.* at 613.

McClendon was admitted to the psychiatric ward of a hospital and stayed there for over thirty days. Although he had tested positive for barbiturates and amphetamines when admitted, three (3) days later both tests provided a negative result. At the arbitration hearing, the physicians indicated that the tests could have shown a false positive in light of the subsequent negative result and fact that the drugs remain in one's body for three to four days. After considering all the evidence, the arbitrator concluded that McClendon suffered a mental breakdown, that it was unlikely that he would suffer another breakdown in the future, that the outburst was not a reaction to drug use, and that McClendon was not at fault because the incident was caused by the breakdown. While the arbitrator considered the potential dangers to other employees and company property if McClendon were reinstated, the arbitrator concluded that concerns over those matters were not significant because of his finding that a future breakdown was remote. The arbitrator thus ordered, *inter alia,* that McClendon be reinstated.

The district court vacated the arbitration award in part because the award violated the public policy of safety in the workplace. *Id.* 613–14. On appeal, the Seventh Circuit delineated the two components to the issue of workplace safety in that case:

> One component is the factual finding made by the arbitrator that the chance of recurrence of McClendon's violent acts is extremely remote. The second component is his judgment that this remote chance of harm to others does not mandate an award against McClendon.

*Id.* at 617. Hence, the Seventh Circuit suggested that the first component of the workplace safety public policy inquiry concerns the factual findings of the arbitrator. Quite simply, just how dangerous is the grievant? The second component deals with the judgment the arbitrator makes concerning the

chance of harm that the grievant would pose to other people in the workplace. That is, on the facts of the case, how significant is the risk of harm to others if the grievant is reinstated?[8] In *DuPont,* Because the arbitrator found that the chance of a recurrence of future violence was unlikely, the Seventh Circuit found acceptable the arbitrator's conclusion that the risk of harm to other people was remote if McClendon were reinstated. As a result, the court reversed the district court and enforced the arbitration award.

■ Insofar as the courts addressed the issue of workplace safety in these cases, the courts focused upon whether the grievant would pose a threat to other people while in the work environment. While none of the courts in those cases explicitly acknowledged such a public policy, each of the courts concentrated on the same issue—the risk or threat of harm from the reinstated grievant—assuming that the public policy were recognized. These courts implicitly recognized that reinstating an violent employee who is likely to harm other employees, coworkers, customers, or people would violate a "well defined and dominant" public policy concerning workplace safety. Thus, I conclude that there is a "well defined and dominant" public policy of workplace safety such that an arbitration award should be vacated if the reinstatement of an employee would violate this accredited public policy.

■ The Seventh Circuit's approach in *DuPont* highlights the critical inquiry for the court to consider. In addressing whether to vacate an arbitration award on workplace safety public policy grounds, a court must first accept the facts as found by the arbitrator to gauge how dangerous the grievant-in-question is. Secondly, the court must then determine on the facts of that case the chance of harm that the grievant might pose to other people in the workplace if reinstated. Keeping in mind that "[a] judgment about the offending employee's 'amenability to discipline' comes under the scope of the arbitrator's factfinding authority," *USPS,* 839

---

8. While a district court must accept the findings of fact of the arbitrator (component one), the court reviews *de novo* the conclusions the arbitrator makes concerning reinstating an employee to ascertain whether a public policy would indeed be violated through the enforcement of the award (component two). *Iowa Elec.,* 834 F.2d at 1427.

F.2d at 149, a court must still determine in light of the arbitrator's discerned facts whether the arbitrator's judgment to reinstate is sound under the circumstances.

### B. Does the arbitration award reinstating Golden violate the public policy of workplace safety?

■ Applying the *DuPont* test to the case before me, I must first look at the facts as found by the arbitrator to determine whether Golden is a severe danger in the workplace.

The Company has failed to meet its burden of showing that Golden's behavior warrants an independent finding of fact by me that Golden is a danger in the workplace. The Company asserts that the facts found by the arbitrator show that Golden is a dangerous and violent individual. While the Company claims that another violent incident could erupt at any moment, Tr. Oral Argument, Jan. 3, 1997, at 25, it never presented the arbitrator with the issue of whether Golden was a "dangerous and violent person," and thus, the arbitrator never had an opportunity to make a factual finding on that issue or whether the risk of future harm from Golden being in the workplace is likely or remote. Instead, the Company charged Golden with "harass[ing], threat[ening], and intimidat[ing] fellow employees in violation of company rules." Arbitration Award at 15. This, therefore, was the scope of the arbitrator's characterization of Golden's conduct—a characterization far different from whether Golden is so dangerous and so violent that his reinstatement would violate the public policy of workplace safety.

■ At the arbitration hearing, the arbitrator found that Golden had been employed at the Company for thirty-one (31) years at the time of his discharge.[9] The arbitrator also concluded that Golden's behavior in driving the clamp truck towards Ofori was intentional, "inappropriate for the workplace," and found that Golden had "open contempt for all employees involved." Arbitration Award at 15. The arbitrator, however, characterized Golden's conduct as a Group "B" offense. Finally, the arbitrator did not find Golden's accounts of the incidents mentioned at the hearing credible. Rather, the arbitrator noted that Golden's rambling testimony "in essence substantiated the accusations leveled against him," namely that he "harass[ed], threat[ened], and intimidate[d] employees in violation of company rules."[10] *Id.*

■ The second component of the *DuPont* test permits me to take those facts and review, *de novo*, the arbitrator's judgment in reinstating Golden to the workplace. More precisely, based on the facts of this case, I must determine if the risk of harm to others is so significant that the reinstatement of Golden would violate the public policy of workplace safety. I find that it is not.

To begin with, the arbitrator found that Golden was guilty of a Group "B" offense by harassing, intimidating, and threatening fellow employees in violation of company rules. I cannot neglect this fundamental finding of fact. Group "B" offenses are not generally considered to be so serious or severe as to warrant the immediate dismissal of an employee without the proper disciplinary procedures being followed; Group "A" offenses

---

9. At oral argument, the Union asserted that in his thirty-one (31) years of service to the Company, Golden has never physically hurt nor harmed anyone, despite the Company's representations that Golden is so dangerous. Tr. Oral Argument, Jan. 3, 1997, at 10.

10. In addition, before me now but not before the arbitrator is the Rule 35 independent examination report by Dr. Timothy Michals ordered by Magistrate Judge Welsh at the specific request of the Company. The Rule 35 examination concludes, "[t]here is nothing in [Golden's] history or examination to identify that he is a clear and present danger to others." Report of Dr. Timothy Michals at 7. Despite the fact that the Com-

pany urged Judge Welsh to order the exam, the Company now seeks to dismiss it because its conclusions completely contradict the Company's theory of the case—i.e., that Golden is a danger to the workplace. As the Rule 35 report is new evidence, as a matter of procedural fortuity for the Company I am not permitted to consider the results of that report in reviewing the arbitration award. *Teamsters Union Local No. 115 v. DeSoto, Inc.*, 725 F.2d 931, 940 (3d Cir. 1984). Despite my equitable inclinations, I have not considered the Rule 35 examination in the adjudication of this matter. Nevertheless, I feel my decision is particularly compelling in light of that report's conclusions.

are. For example, some Group "A" offenses include falsification of any records or giving false information for company records; unprovoked assault on another employee or member of management; direct disobedience to a supervisor; entering or leaving the plant without permission during working hours; knowingly punching the time card of another employee or having one's time card punched by another person; gambling on company property; or bringing in concealed fire arms or any deadly weapon on the company premises or property for any reason. Shop Rules at 7. In contrast, Group "B" offenses include engaging in fighting on plant premises at any time; conducting oneself in a manner contrary to recognized standards of morality and decency on company property; performing or assisting another to perform personal work in the plant at any time; coercing, intimidating, or threatening fellow employees; distributing written or printed literature on company property without company authorization, except literature authorized by the Union and the Company; posting or removing notices, signs, or writing on bulletin boards or company property without company approval, except notices dealing with Union meetings; use of company or public telephone without permission from the supervisor or the foreman. *Id.* at 9. That the arbitrator concluded that Golden's conduct was a Group "B" violation indicates that he did not find that Golden's actions rose to such an extreme level such that Golden's reinstatement would violate public policy.

I cannot infer from Golden's past altercations that he is so dangerous and violent that his reinstatement would violate the exacting standards that vacating an arbitration award under public policy dictate. There is a giant leap from a finding that Golden intended to hit the box truck being guided by Ofori's hand-propelled jack to a finding necessary for a violation of public policy, that Golden is a violent and dangerous person in the workplace. If the Company wanted the arbitrator to make such a finding, it should have presented the relevant evidence and arguments at the arbitration hearing. It had an opportunity to do so simply by charging and proving more egregious behavior which it failed to do.

A ruling along these lines should serve as a guide to future litigators of the need to address to the arbitrator the factual underpinnings necessary to sustain a court's finding of a violation of a public policy. A ruling that permits a company from withholding from the arbitrator the ability to make the predicate finding for a violation of public policy is contrary to the gravamen of *DuPont.* A company should not be permitted for the first time to raise the factual basis for a finding on a violation of public policy in the district court. Better policy requires that a company wishing to assert a violation of public policy argument raises the necessary facts, if possible as it was in this case, to the attention of the arbitrator so that he or she can make the necessary factual determinations and the court can draw the necessary inferences from those facts to decide that public policy issue appropriately and within its mandate to do so.

Taking all of the arbitrator's findings into account, I conclude that the Company did not meet its burden on the issue that reinstating Golden would violate the public policy of workplace safety. As a result, I will grant summary judgment in favor of the Union and enforce the arbitration award.